Argued January 14, modified January 26, rehearing denied March 2, 1915.

## COE *v.* COE.[*]

(145 Pac. 674.)

**Divorce—Evidence—Sufficiency.**

1. Evidence *held* sufficient to justify a decree for divorce and the custody of the children in favor of defendant.

**Trusts—Resulting Trusts—Husband and Wife—Evidence.**

2. To establish a resulting trust in favor of a husband of property purchased by him with title taken in his wife's name, it must

[*]On the question of the creation of a resulting trust, see notes in 5 L. Ed. (U. S.) 651 and 34 L. Ed. (U. S.) 1091.        REPORTER.

be shown to have been understood between the parties, at the time the title was taken, that the wife was to hold it as trustee.

[As to definition of resulting trust and when it is created, see note in 51 Am. Dec. 751.]

**Trusts—Resulting Trusts—Evidence.**

3. Evidence *held* insufficient to establish a resulting trust in favor of husband buying property and taking title in his wife's name.

**Trusts—Resulting Trust—Evidence.**

4. The evidence to establish a resulting trust is not required to go so far as to be free from doubt.

From Multnomah: HENRY E. McGINN, Judge.

Department 2.    Statement by MR. CHIEF JUSTICE MOORE.

This is a suit by Viola M. Coe against Henry W. Coe, for a dissolution of their marriage contract and for the custody of their two sons, whose ages are respectively 18 and 20 years.   She also instituted a suit against the defendant and a Sanitarium Company, a corporation, for an accounting.   These suits were consolidated, and issues having been joined, were tried, whereupon the defendant secured the divorce, the custody of the children, and it was decreed that certain real property, the title to which stood in the plaintiff's name, was held in trust by her and she appeals.

MODIFIED.    REHEARING DENIED.

For appellant there was a brief over the names of *Mr. Charles W. Fulton* and *Messrs. Joseph & Haney*, with oral arguments by *Mr. Fulton* and *Mr. George W. Joseph*.

For respondent there was a brief over the names of *Mr. A. E. Clark* and *Mr. Malcolm H. Clark*, with an oral argument by *Mr. A. E. Clark*.

Opinion by MR. CHIEF JUSTICE MOORE.

The testimony shows that the parties were married at Mandan, North Dakota, June 24, 1882. Prior to their wedding the plaintiff had been engaged in teaching school and the defendant in practicing medicine. Desiring to obtain a better education, the plaintiff, after the birth of her eldest son, now 29 years old, attended a medical college, from which she received a diploma, and is a licensed physician. In the year 1891 the parties moved to Portland, Oregon, where the defendant resumed the practice of his profession. Soon thereafter he commenced as a specialist to treat patients afflicted with nervous and mental ailments. In September, 1899, he incorporated the Sanitarium Company with a capital stock of $30,000, to which corporation he transferred the business, furniture, equipment, etc., receiving in payment thereof 157 shares of the capital stock of the par value of $15,750. In the year 1903 the Sanitarium Company secured the title to about 15 acres of land at Mt. Tabor, then a suburb of Portland, and erected on the premises buildings and equipment for the service in which it was engaged. In the succeeding year the Sanitarium Company entered into a contract with the United States for the care and treatment of insane patients from Alaska for the term of five years, which agreement has been renewed and is now in force. The rapid growth of the City of Portland greatly increased the value of the Mt. Tabor lands, and the care of the patients by the Sanitarium Company became quite profitable, so much so that other physicians secured shares of the capital stock of the corporation, and Dr. Coe, though nominally in charge of the hospital, left much of the actual management to his associates, while he engaged in

other business. From a sale of a part of his capital stock and from other sources, the defendant accumulated a large sum of money, and, considering himself quite wealthy, he concluded to purchase in Portland real property and to erect thereon a family residence, the original cost of which should not exceed $20,000. In order to carry out that purpose, two lots were pur-; chased at an expense of $7,500, but, when the place for the house was prepared, it was deemed desirable to buy two adjoining lots, for which a further sum of $8,000 was paid. The legal title to all such real property was taken in the plaintiff's name. The person in charge of the construction of the dwelling was directed by Dr. Coe to defer to the wishes of his wife in all matters pertaining to the erection of a three-story house with a basement, which, when finished, cost about $54,000. The furniture, furnishings, etc., for the house were purchased for about $10,000, thereby incurring an entire outlay of about $79,500, which sum, when paid, left the defendant with but little ready money and also absorbed nearly all of his outside property. In October, 1907, a financial depression arose, and the defendant's creditors began to press the payment of his promissory notes, whereupon he urged Mrs. Coe to sell the house, and with the money to be thereby obtained discharge his obligations, and from the remainder to purchase a less expensive house, but she refused to comply with such request. The defendant, finding it necessary to maintain a large house with but little income, began to give his attention to the sale of irrigated lands in Umatilla County, Oregon, to accomplish which he organized the Columbia Land Company, a corporation. The Inland Irrigation Company, a corporation, the owner of a large tract of such lands, entered into a contract with the

Columbia Land Company, pursuant to which agreement the defendant employed many agents whom he sent to various states to induce prospective purchasers to visit Oregon and inspect these lands with a view of buying parts thereof. He also undertook the development of a town site at Stanfield, a railway station in the tract of irrigated lands, where several buildings were erected, and he also organized at that place the Stanfield Bank, of which he became president. The Inland Irrigation Company stipulated to pay a commission for the sale of its lands, and Dr. Coe and his agents, as brokers and employees of the Columbia Land Company, negotiated the sale of real property amounting to $900,000, of which, however, $200,000 consisted of options, on account of which small payments had been made. In dealing with the owner of such lands, the defendant, as the managing agent of the Columbia Land Company, discovered that the expense incurred in securing purchasers exceeded the commissions stipulated, and in consequence thereof overdrew his account with the latter corporation and failed to pay over to the Inland Irrigation Company $102,000, which had been received for the sale of lands in excess of the commissions. He, as a partner of W. J. Sloan & Co., secured from the Bank of Stanfield a loan of $5,000, giving a firm note as evidence thereof. As partial payment of the overdraft referred to, the Columbia Land Company stipulated to build for the Inland Irrigation Company an additional dam in the Umatilla River to facilitate the storing and distribution of water to be used on these lands.

The defendant in July, 1910, in order to obtain what he regarded as a much-needed rest, made preparation for a trip to the Orient. Mrs. Coe urged him to go, and furnished him with $1,000 with which to pay his

expenses. Before starting on his journey, Dr. Coe called to Portland his chief agents in negotiating the sale of irrigated lands, and the superintendents of other branches of industry, with whom he conferred in respect to the management, during his absence, of the business in which he was interested. He also executed to his eldest son, George Coe, a power of attorney to enable him properly to execute papers for him. The defendant left San Francisco, California, for Honolulu, Hawaiian Islands, July 26, 1910, arriving at the latter city in about six days. Soon after his departure from Portland, Mrs. Coe, hearing rumors of his financial embarrassment, went with an attorney to Stanfield, Oregon, where she learned the facts with respect thereto. Thereupon she discharged the agents engaged in the sale of lands and other persons, informing them that Dr. Coe had gone abroad in order to obtain rest. At the same time she also executed to the Stanfield Bank, in place of the obligation given to it by the defendant as W. J. Sloan & Co., her promissory note for $5,000, upon which an action was immediately instituted and the home property in Portland attached as security for any judgment that might be recovered. Returning to her home she tried without avail to borrow money with which to liquidate Dr. Coe's debts and also to protect his interest under the contract with the Inland Irrigation Company. Finally, by the aid of a personal friend of Mr. Sigmund Frank, a loan of $33,000 was obtained to be secured by a mortgage on her home, but, discovering the power of attorney referred to was inadequate, the defendant, pursuant to a cablegram sent by his son George, executed to him at Honolulu another instrument granting greater authority, and conformable therewith the mortgage was given, the money obtained and paid out in dis-

charging Dr. Coe's liabilities. After the mortgage was executed, a rumor gained credence that Dr. Coe's trip abroad was caused by some mental ailment with which he had been and was suffering. When in Honolulu Dr. Coe received from his wife a letter to the effect that all his business interests were in fine condition, and she hoped soon to join him, though at that time she was very much worried and was making every possible effort to ward off what appeared to be an impending financial catastrophe. The defendant mailed a photograph, representing him as sitting at a banquet, and having on his head and around his neck floral wreaths. Nearly every other gentleman and lady at the table was pictured as having like adornments around the neck. This print was entitled: ''The Lonely Man at the Luau, Honolulu, Aug. 13, 1910.'' Another small photograph was also mailed, portraying the defendant and two ladies as occupying chairs, one at his right and the other at his left, while three other ladies were standing behind him. This picture bore the inscription: ''In the Hands of his Friends, Honolulu, Aug. 1910.'' After the receipt of these pictures, George Coe, on October 12, 1910, wrote his father, saying in part:

''We have tried to get money at the banks but because of the 'crop moving period' money has been awful tight. This coupled with *the fact* that 'Dr. Coe spent money like a drunken sailor' (at Stanfield); 'Dr. Coe does not know the value of a dollar'; 'Dr. Coe is a fugitive from justice and his affairs have gone to the dogs and he is now a bankrupt'—all stories spread broadcast by Moody and repeated so many times that even our friends have begun to believe there is some truth in the statements.  * * Now to get to the real point. We have got to ask you to cut down your expenses. The way I figure it out you have been gone

12 weeks and have spent 1,200 dollars or at the rate of 100 a week. This (100) is too much and *we* can't stand it. You can live very comfortably on 75 a month and luxuriously on 100 and you not only ought to but *you must do so.* * * Carey does not want you to come home until we get everything settled. * * So you stay there until we send for you. Of course on 75 or 100 a month you can't do very much [many] 'millionaire' stunts but that is the best we can do. This will all come out all right in time but it will take time. Meanwhile we are *nearly* broke (living here on borrowed money only)."

George Coe on October 22, 1910, wrote his father, again saying in part:

"I am extremely sorry but I must say to you that we cannot provide you with any further funds. Don't draw any more checks on us; that is, against either your own account or of the sanitarium. * * Sell the presents you wrote you had bought on your journey and that will give you some money. Get into a cheap boarding-house and look around and find some light job which will make you self-sustaining and remain out of the country. You could do no good here. Carey agrees with us in this matter."

Dr. Coe reached San Francisco on his return trip October 29, 1910, and wired his son George as follows:

"If not needed Oregon will go to Berkeley for month. Have seen telegram. If indicted would come immediately. Answer."

In response he received a message on the same day, signed "M. Coe," which reads:

"Carey says come. Conditions might be worse. Wire when starting."

Replying he telegraphed George Coe as follows:

"Leaving to-night for Portland to help whip our outside enemies."

Before reaching Portland, however, he saw in a daily newspaper a published statement to the effect that the Sanitarium Company had sold and disposed of all its property. Upon arriving home he learned that Mrs. Coe was the ostensible purchaser.

It is needless to detail the circumstances of such sale or to narrate the business that was subsequently conducted for about two years under the plaintiff's management. The facts referred to have been stated in order to show the relation of the parties to each other and to determine therefrom who, if either, is entitled to the divorce. Mrs. Coe testified: That, while she objected to selling the home because she feared that all the money derived therefrom would be lost in the Eastern Oregon venture, she was ready and willing to mortgage the property to aid in liquidating Dr. Coe's debts. That she desired him to make the trip abroad because of the nervous strain which a close attention to the sale of the irrigated lands had imposed upon him, and she wrote him that the business was in a flourishing condition because she did not wish to burden him with any more anxiety, and that she was unable to write him but once, since she did not know where to address him. This latter statement seems to be confirmed by the fact that the letters written him by his son, to which reference has been made, were not delivered but returned and received after the defendant reached home. George Coe testified that these letters were written after having received the photographs referred to, and while he believed his father was associating with immoral persons. The defendant's testimony shows: That it is the custom at Honolulu, as evidenced by the larger picture, to adorn guests at a banquet with floral wreaths. That in the smaller photograph the women represented as sitting

beside and standing behind him were a mother and her daughters, who were traveling companions. Copies of the original letters mentioned were received in evidence, and George Coe, referring to them, stated upon oath that he prepared them, as originals, but his mother underscored the words hereinbefore emphasized, corrected one word in brackets, inserted the words indicated in parentheses, and also added to the letter of October 12th the following:

"Sell cigars to send last 100. Sloan is having a heap of a time collecting his 20,000.00, as every one says, 'Dr. Coe said he would take care of me.'"

It appears from the testimony that prior to July, 1910, and before Dr. Coe left home Mrs. Coe visited and consulted with a mental alienist at Seattle, Washington, and detailed to him the symptoms and conduct of a person whose name was not given, and, based upon the hypothetical case, the physician informed her that the individual referred to was afflicted with "paranoia." At Portland, Oregon, she also conferred with two physicians, who are experts in mental ailments, and, predicated upon the same hypothetical case, they informed her that the supposed patient was troubled with "paranoia." George Coe testified that with this information, which did not consist of a written opinion from either physician, his mother had instructed him to meet his father in San Francisco, upon his return from China, and have him incarcerated in some hospital for the insane in California. Mrs. Coe denied this statement and testified that its mere recital demonstrated its absurdity, saying that commitments to asylums were not made upon such showings. She on February 3, 1913, subscribed her name and made oath to an

affidavit wherein it is stated that it was executed after
due and careful consideration; that a serious difficulty
had arisen between Dr. Coe and her, as to whether
their home, which had been erected at his expense
upon lots which had been conveyed her as a present
from him, should be sold and the proceeds invested in
his business; that she had declined to accede to his
frequent requests to sell such property, thereby creat-
ing a condition of intense tension between them; and
that statements which he made and other matters
which arose led her to declare that he was mentally un-
sound; that, from the time their house was nearly c m-
pleted until the culmination of the troubles in respect
to Eastern Oregon matters, he was laboring under
great business cares and serious financial anxieties,
occasioned by the withdrawal of large sums of money
invested in the house, and was much overworked and
worried; "that the lapse of time, and with a deliberate
study of the whole situation, I now clearly see that
this whole matter was not one of mental import in any
degree but simply and only was a business disagree-
ment which then appeared to me irreconcilable.    I am
certain my husband has no mental disease now, and
that he never has had a mental disease of any kind or
character."

1. Upon this evidence the court gave the defendant
a decree of divorce and the custody of the two minor
sons.   We concur in the conclusion thus reached.   In
doing so, however, and without any direct evidence on
the subject, it would seem to be inferred that Mrs. Coe,
realizing the serious financial difficulties which Dr. Coe
had encountered, and possibly fearing his indictment,
as indicated in his telegram, began to formulate the
defense of insanity.   This view of the case is char-

itable, though only conjectural; but, however that may be, the court, having seen the witnesses and heard their testimony, had a superior advantage in determining the equities of the cause.

After Dr. Coe returned from the Orient, he made an amicable settlement with the Inland Irrigation Company, whereby he secured the legal title to some land in Umatilla County, Oregon, in recognition of the amount due him. He executed to Mrs. Coe a deed to most of the lands thus obtained. In disposing of the property interests, it was decreed that the plaintiff holds the legal title to lots 1, 2, 6 and 7 in block 15 in Goldsmith's Addition to the City of Portland, with the house thereon, in trust, however, for the defendant as a home and place of residence for him and his family, and that the plaintiff and the defendant and their sons, or any or either thereof, shall have the right to make all reasonable use of the house, grounds and equipment as a home and place of residence. The defendant, in referring to the purchase of these lots and the building of the house thereon, testified as follows:

"I had a talk with her, I—I talked with her as a man would naturally talk to his wife. She said she wanted a home in her name; and I said, 'Certainly, you shall have the home in your name.' It was her home, but, of course, I did not think that she would ever claim it as her own property to the exclusion of the rest of the family. I said, 'You would have to sign a deed with me if I sold my property, and I with you;' and I said, 'I am building a home for my children, my wife, and myself'; so I put it in her name—the lots. I did not dream that there would be any difficulty in doing so. It was a home for my children, my wife, and myself."

Dr. Coe was asked:

"And did the Columbia Land Company owe Mrs. Coe anything at that time?" (referring to the time the mortgage for $33,000 was given).

He answered:

"The Columbia Land Company owed that house and it was in her name."

Counsel, not considering the answer responsive to the inquiry, requested the question to be read to the witness, whereupon the court remarked:

"I think that is an answer to your question. I think he meant that house was conveyed to her for the benefit of the family, and not as her own personal property, to do as she saw fit to do with it. Of course, he put up the money, and it was conveyed to her as trustee for the family."

To which observations the witness responded:

"You bet your life."

2–4. The foregoing comprises all the testimony tending to establish a resulting trust, and, as between husband and wife, we think the evidence is insufficient for that purpose: *Parker* v. *Newitt,* 18 Or. 274, 277 (23 Pac. 246, 247). In that case Mr. Justice LORD, in discussing this subject, says:

"Moreover, the *onus* of establishing a resulting trust rests upon him who seeks its enforcement; and before a court of equity will be warranted in making a decree therefor, the evidence must be clear, definite and free from doubt. Hence, to entitle the plaintiff to conveyances of the premises in controversy to himself he must fairly establish, if he paid for the property and took title in the name of his wife, that at that time it was mutually understood and was the intention that she should hold the title to the premises, not in her own right, but in trust for him, or, if it was money

in her possession belonging to him with which she bought the property and paid for it and took the title to herself, that it was done without his knowledge or consent or direction. As advancements are ordinarily, if not always, voluntary, in order to ascertain whether the transaction was a trust or intended as an advancement, when the title is in the name of the wife, the intention at that time is the point of inquiry, and to which we must look."

In the language thus quoted, what is said about the evidence necessary to establish a resulting trust being "free from doubt" is a degree of proof not required in civil cases.

When the lots were purchased for the purpose of erecting thereon a house, Dr. Coe considered himself possessed of adequate means to construct a dwelling, the entire cost of which property, when improved, would not exceed his expectations. No agreement was entered into by Dr. Coe and Mrs. Coe when the real property was purchased and the deed secured whereby she stipulated to hold the legal title in trust for him or for any purpose. This being so, an error was committed in the part of the decree disposing of the home. The defendant is entitled to the undivided third part in his individual right in fee of the whole of lots 1, 2, 6 and 7 in block 15 in Goldsmith's Addition to the City of Portland, and the plaintiff is entitled to the remainder of the estate in such premises: Section 511, L. O. L. The defendant's interest in these lots to be charged, as is also all other real property conveyed by him, to the plaintiff, with the mortgage of $33,000. All the furniture, furnishings, etc., in the dwelling-house, that are not fixtures, having been purchased with the money furnished by the defendant, are hereby set apart to him.

The decree will therefore be modified as herein indicated, but in all other respects it is affirmed.

MODIFIED.   REHEARING DENIED.

MR. JUSTICE EAKIN, MR. JUSTICE BEAN and MR. JUSTICE HARRIS concur.