MATHER, RESPONDENT, *v.* MUSSELMAN ET AL., APPELLANTS.

(No. 6088.)

(Submitted April 21, 1927.  Decided May 5, 1927.  Re-argued on rehearing June 10, 1927.  Decided June 27, 1927.)

[257 Pac. 427.]

*Trusts — Constructive Trust — Complaint—Sufficiency—General Denial—Proof Admissible—Account Stated—Open Account—Evidence—Erection of Building—Cost—Estimates by Experts—Admissibility in Evidence.*

Trusts—Constructive Trust—Complaint—Sufficiency.
  1.  Complaint in an action to establish a constructive trust in a building, alleging a fiduciary relation existing between the parties, its breach by defendant in inducing plaintiff to furnish all the money necessary for its construction, whereas each had agreed to furnish one-half thereof, the wrongful taking of title by defendant to one-half of the property, *held* sufficient, and not to have been rendered insufficient by an affirmative allegation to the effect that defendant joined in the execution of a note secured by mortgage on the property to the extent of approximately half its value executed near completion of the structure.
Constructive Trust—Evidence—Sufficiency.
  2.  Evidence *held* sufficient to sustain the finding in favor of plaintiff in an action to establish a constructive trust in real property, under the rule that in such a case the evidence must be clear, convincing, satisfactory and practically free from doubt.
Same—General Denial—Proof Admissible.
  3.  The rule that under a general denial defendant may prove any fact which goes to controvert the facts which plaintiff is bound to prove to sustain his cause of action or which is inconsistent with and thus negatives plaintiff's cause of action is ap-

[79 Mont. 566.]

plicable in an action to establish a constructive trust, even though fraud and the violation of fiduciary relations be shown, the contention that under the doctrine that he who comes into a court of equity must come with clean hands, defendant should not be heard in defense, not being maintainable.

Same—Under General Denial of Plaintiff's Allegation That He Furnished All Funds for Acquisition of Property Defendant may Show, What.

4. Where plaintiff, one of two joint adventurers, in an action against his coadventurer to establish a constructive trust, asserted that he had furnished all the funds for the joint enterprise, defendants under their general denial should have been allowed to introduce evidence that they contributed toward the cost, that the total cost was in excess of the amount claimed by plaintiff, etc.

Accounts Stated — Pleading — Open Accounts — What Defendant may Show Under General Denial.

5. An account stated partakes of the nature of a contract between the parties, and in order to prove omission from or mistakes in the statement it must be pleaded, whereas in the case of an open and unsettled account challenged by plaintiff, defendant, under a general denial, may show any fact tending to defeat plaintiff's prima facie case.

Constructive Trust — Erection of Building — Cost — Estimates by Experts—Admissibility in Evidence.

6. Where in an action to establish a constructive trust in a building plaintiff claimed that his coadventurer in its erection, who was dead at the time of trial, had contributed nothing to its cost and who, in active charge of the work, had kept no books, his successors in interest were properly permitted to introduce estimates of the cost of replacement by experts of unquestioned ability in support of their claim that decedent had contributed substantial amounts in excess of the cost claimed by plaintiff.

---

[1]  Appeal and Error, 4 C. J., sec. 2677, p. 745, n. 74.  Trusts, 39 Cyc., p. 169, n. 13, p. 173, n. 32, p. 175, n. 33, 34, p. 623, n. 60.

[2]  Appeal and Error, 4 C. J., sec. 2853, p. 876, n. 78.  Trusts, 39 Cyc., p. 193, n. 8.

[3]  Pleading, 31 Cyc., p. 694, n. 72.  Trusts, 39 Cyc., p. 182, n. 66.

[4, 5]  Accounts and Accounting, 1 C. J., sec. 252, p. 680, n. 81, 82; sec. 276, p. 691, n. 96, 97; sec. 358, p. 716, n. 11.  Trusts, 39 Cyc., p. 191, n. 2, p. 629 n. 4.

[6]  Evidence, 22 C. J., sec. 1222, p. 976, n. 67.  Trusts, 39 Cyc., p. 192, n. 3 New, p. 193, n. 8.

*Appeal from District Court, Cascade County; E. W. Ewing, Judge.*

ACTION by Robert Mather against G. W. Musselman and wife. Judgment for plaintiff and defendants appeal. Reversed and remanded, with directions.

---

6. Attack on items of account stated under general denial, see note in 62 **Am. Dec.** 92.

*Mr. W. F. O'Leary* and *Messrs. Cooper, Stephenson &*
*Hoover,* for Appellants, submitted an original and a reply
brief; *Mr. O'Leary* argued the cause orally.

Every allegation of plaintiff's complaint shows that he is
entitled to an action for an accounting, and nothing else,
because fraud is not the basis of his action. It is founded
upon the agreement which created the trust relation and con-
stituted the respondent and Musselman joint adventurers.
(*Miller* v. *Walser,* 42 Nev. 497, 181 Pac. 437; *Gates* v. *Megar-*
*gel,* 266 Fed. 811; *Lind* v. *Webber,* 36 Nev. 623, Ann. Cas.
1916A, 1202, 50 L. R. A. (n. s.) 1046, 134 Pac. 461, 135 Pac.
139, 141 Pac. 458; *State ex rel. Brinkman* v. *McElhinney*
(Mo.), 216 S. W. 521.) In his attempt to set forth a cause
of action that will entitle him to a constructive trust, he has
really set forth a cause of action for an accounting and has
demanded the wrong relief. All of the cases hold that a trust
cannot be constructed upon such a state of facts as here
shown. He has merely alleged a cause of action for an ac-
counting, and the following cases so hold: (*Worms* v. *Lake,*
198 App. Div. 776, 191 N. Y. Supp. 113; *Worms* v. *Lake,* 120
Misc. Rep. 210, 198 N. Y. Supp. 861; *Proctor & Gamble Co.*
v. *Powelson,* 288 Fed. 299; *Newby* v. *Atlantic Coast Realty*
*Co.,* 182 N. C. 34, 108 S. E. 323; *Keyes* v. *Nims,* 43 Cal. App.
1, 184 Pac. 695; *Josias* v. *Sugar Products Co.,* 169 N. Y. Supp.
887; *Butler* v. *Union Trust Co.,* 178 Cal. 195, 172 Pac. 601;
*Kaufman* v. *Catzen,* 81 W. Va. 1, 94 S. E. 388; *Joring* v.
*Harriss,* 292 Fed. 974; *Gates* v. *Megargle,* 266 Fed. 811;
*Miller* v. *Walser,* 42 Nev. 497, 181 Pac. 437; *State ex rel.*
*Brinkman* v. *McElhinney* (Mo.), 216 S. W. 521.)

*Messrs. Maddox & Church,* for Respondent, submitted a
brief; *Mr. Fletcher Maddox* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the
court.

The plaintiff, Robert Mather, commenced an action in equity
against the defendants, G. W. Musselman, and Vivian K. Mus-

selman, his wife, as the grantees of one J. J. Musselman, for the purpose of having the defendants declared involuntary trustees for plaintiff as to a one-half interest in a certain apartment house in Great Falls.

The complaint alleges that upon representations made by J. J. Musselman, in whom and in whose representations plaintiff had the utmost confidence, plaintiff entered into a joint adventure with J. J. Musselman for the erection of an apartment house in Great Falls, Musselman having full charge of the erection thereof, while plaintiff remained in Pennsylvania, each of the joint adventurers to put up one-half of the cost, but Musselman to be allowed the same compensation as though he was doing the work for strangers. It is then alleged that plaintiff from time to time forwarded to Musselman his part of the cost, but that Musselman contributed nothing toward the cost of the building and diverted to his own use plaintiff's money in excess of any amount which Musselman might have earned in the erection of the building, and thereafter, "knowingly and wilfully and with the intent to cheat and defraud the plaintiff and to obtain an undue advantage * * * and acquire, hold, and claim a larger interest therein than he otherwise would be entitled to under the terms of their joint adventure, * * * " rendered a false statement of the cost, intending that the plaintiff should rely thereon and believe the same to be true. The complaint sets out at length the particulars in which plaintiff claims the statement furnished is false and fraudulent.

Issue was joined and the trial of the cause commenced before the court and a jury, but, after five days of trial, the court discharged the jury and referred the matter to a referee, with instruction to take testimony and report to the court thereon, "particularly as to the amount J. J. Musselman contributed" toward the construction of the building. The referee made findings to the effect that the lot was purchased by the joint adventurers and a building erected thereon at a cost of $80,677.21, financed as follows:

Money contributed by plaintiff ...... $22,543 85
Money contributed by Musselman.... 18,133 36
Money borrowed on first mortgage.... 40,000 00 $80,677 21
—and recommended that defendants be compelled to pay to plaintiff one-half of the difference between the amount contributed by plaintiff and that contributed by Musselman, and that they then hold the premises as tenants in common.

The court thereafter rejected the findings of the referee and declared that the defendants held the one-half interest in the premises in trust for plaintiff and ordered them to convey it to him. From this judgment and decree defendants have appealed; they make numerous assignments of error. The questions raised by the assignments will sufficiently appear from the following discussion:

1. The defendants first contend that the complaint does not [1] state facts sufficient to constitute a cause of action or entitle plaintiff to the relief sought. This contention is based upon the fact that, while the complaint alleges fraud and that J. J. Musselman contributed nothing toward the cost of construction, but represented that he had contributed his share thereof, it affirmatively appears therefrom that he was jointly obligated on the note secured by mortgage, and therefore contributed the one-half of the amount realized on the loan.

In addition to alleging fraud and misrepresentation, the complaint alleges that the plaintiff had implicit confidence in Musselman; relied upon his representations that he would match the money put in by plaintiff dollar for dollar and his subsequent representations that he had done so, and would not have gone into the joint enterprise except for those representations and his confidence in Musselman's honesty and integrity. It also appears therefrom that Musselman had full charge of their joint affairs, while the plaintiff remained in a distant state and was forced to leave the matter wholly to Musselman.

"It is a well-settled general rule that if one person obtains the legal title to property, not only by fraud or by violation

of confidence of fiduciary relations, but in any other uncon-
scientious manner, so that he cannot equitably retain the
property which really belongs to another, equity carries out its
theory of a double ownership, equitable and legal, by impress-
ing a constructive trust upon the property in favor of the
one who in good conscience is entitled to it, and who is con-
sidered in equity as the beneficial owner." (26 R. C. L.
1236, and cases cited; *Lewis* v. *Lindley,* 19 Mont. 422, 438,
48 Pac. 765.) "Equity declares the trust in order that it
may lay its hand on the thing and wrest it from the pos-
session of the wrongdoer." (26 R. C. L. 1232, and cases
cited.) Here the "thing" in question is the one-half in-
terest in the lot and building standing in the name of the
defendants by transfer without substantial consideration, so
that the defendants stand in the shoes of J. J. Musselman.

If, in fact, as alleged in the complaint, Musselman furnished
no part of the money which went into the purchase of the
lot and the construction of the building, the trust created
will arise as of the time of the inception of the fraud and
misrepresentations on which it is based and, therefore, when
later Musselman joined in the note and mortgage on the
building erected, he will be held to have done so as trustee
for plaintiff, and not on his own account.

The complaint here differs materially from that considered
in *State ex rel. Brinkman* v. *McElhinney* (Mo. Supp.), 216
S. W. 521, relied upon by defendants. There the fact that
the wrongdoer joined in executing a note and mortgage was
only considered in connection with the allegations showing
that, while the wrongdoer did not contribute his full share
toward the purchase of the property, he did in fact contrib-
ute a substantial portion thereof; under these conditions it
was held that the complaint did not state facts sufficient to
create a constructive trust.

Here the allegations of the complaint are, in effect, that
Musselman by actual fraud and misrepresentations induced
plaintiff to advance all of the money which went into the

purchase of the lot and the construction of the building, and thus secured title to the one-half interest therein without putting in anything but his labor, and, not content with this, converted to his own use sufficient of plaintiff's money to more than pay him for his labor. If these allegations are true—and they must be assumed to be true for the purpose of testing the sufficiency of the complaint—equity will not permit the wrongdoer to retain an interest in the property merely because he joined in the note and mortgage placed upon the property, but will declare a constructive trust in the property as of the date of the wrongful acts of the party, antedating the encumbrance, and declare that in securing the loan and placing the encumbrance on the property he did so as trustee for the party entitled to the property. While we have found no decided cases in point, such a holding is within the spirit and rules of equity with regard to such trusts.

The complaint is sufficient to warrant the relief sought, i. e., the establishment and declaration of a constructive trust, if the facts therein alleged were proved on the trial, in that it alleged a fiduciary relation existing between Mather and Musselman, the breach thereof, the furnishing of all of the money necessary by Mather, and the wrongful taking of title to one-half of the property by Musselman. (*Word* v. *Moore,* 66 Mont. 550, 214 Pac. 79; *Eisenberg* v. *Goldsmith,* 42 Mont. 563, 113 Pac. 1127; *Meagher* v. *Harrington,* 78 Mont. 457, 254 Pac. 432.)

2. The case was tried upon the theory of constructive trust alone, and counsel for both plaintiff and defendants now assert that the action did not and could not involve an accounting between the joint adventurers; the defendants did not attempt to accurately show the exact cost of the building, but merely to show that Musselman contributed toward the construction a substantial amount in addition to the funds furnished by Mather; they contend that they made such a showing, and that therefore the evidence, taken as a whole, did not warrant or justify the judgment rendered.

A fair analysis of the evidence of both plaintiff and de-
[2]  fendants discloses the following facts:

Musselman and Mather were boyhood friends in Pennsyl-
vania, where Musselman commenced to learn the trade of car-
penter and builder at the age of eleven years; he had no
education other than that received from experience. In 1910
Musselman came to Great Falls and began business as a con-
tractor and builder. Mather remained in Pennsylvania and
engaged in the hotel business. In 1921 Musselman visited
Mather and remained with him for a period of about a month,
during which time the two talked over the opportunities for
investment in Great Falls and entered into a tentative agree-
ment to jointly purchase a lot in that city and erect thereon
an apartment house, Musselman stating that he could raise
approximately $20,000, and Mather agreeing that he could
put something like $10,000 or $12,000 into the venture.
Mather relied implicitly upon the honesty and integrity of
Musselman and agreed to furnish money as needed, so far as
he was able, which Musselman was to match dollar for dollar,
Musselman to attend to the erection of the building and to
receive the same compensation as though he was building the
structure for strangers. No agreement was reached as to
how much was to be invested in the enterprise, but when
cash was exhausted, Musselman was to mortgage the prem-
ises, in the joint names of the two, for the needed balance.

On September 4, 1921, Musselman, who had but the rudi-
ments of an education, wrote Mather from Great Falls, inclos-
ing a ‘plat of that city, on which was marked the location of
several “desirable” lots, including the lot thereafter pur-
chased. In the letter he stated that he had “bought” this
lot for $4,500; that it was a good buy at any sum up to $8,000,
but that, as the sellers were in need of $1,500 at once, they
were willing to dispose of it at the low figure mentioned. It
is clear from the letter that Musselman intended to advise
Mather, not that the lot had been purchased, but that it could
be purchased for $4,500; he stated that, if Mather wanted to

go in on the purchase and thereafter erect a building on the lot, to send him $3,000, of which he would consider $750 as a loan to be repaid, and for which he would give Mather his note. Mather agreed, and remitted $3,000 to Musselman. However, instead of either paying the full $4,500 for the lot, or the difference between that sum and the $1,800 left as an encumbrance on the lot, Musselman paid but $1,447.50 in cash for the lot, subject to the mortgage of $1,800, making the total cost $3,247.50, instead of $4,500. Whether Musselman originally misrepresented the price for which the lot was offered in September, 1921, or whether he succeeded in securing a reduction in the cost price during the three months or more which elapsed between the writing of the letter and the actual purchase of the lot, does not appear, but that he sought to mislead Mather as to the amount paid for the lot would seem to be clear, from the fact that the deed was executed on December 26, 1921, and the scrivener placed thereon revenue stamps amounting to $1.50, which would indicate that, although the consideration recited was but $1, that paid was approximately $1,500; these stamps were canceled by Musselman. The deed was then sent to Mather, and when received it bore additional stamps for $1.50, apparently canceled by Musselman on December 27, 1921, so that anyone examining the deed would conclude that the actual cash consideration paid was approximately $3,000.

Musselman did not, however, attempt to charge Mather $2,250 for his interest in the lot, but merely deposited the $3,000 remitted in the fund from which he thereafter drew in payment for the lot and the erection of the building, so that any misrepresentation made concerning the cost of the lot did not injure Mather or affect the final total cost of the joint adventure. On advising Mather of the final purchase, subject to the mortgage, Musselman assured Mather that he would pay the amount of the mortgage later and thus clear the title to the lot.

Considerable correspondence followed as to the nature of the building to be erected, and it was finally agreed that it should be a four-story building covering the lot. Musselman advised Mather that they would have to have plans and specifications drawn and approved by the city engineer, and that the architect's fee would be five per cent of the cost of construction, and that the estimated cost of such a structure would be approximately $70,000. Mather agreed to all recommendations made by Musselman and left him to attend to their joint business. Musselman advised Mather that he had on hand $10,000 worth of material which would go into the building, and later that he had made all door and window frames needed from material on hand. During the course of construction, which took nearly a year, Mather forwarded money to Musselman from time to time, the total of which, including the $3,000 forwarded for the purchase of the lot, was $15,000. As received, Mather's checks were deposited in Musselman's private account in the bank, and, from time to time, he borrowed sums from the bank, totaling $16,000, also deposited in this account, and in addition deposited further sums from unknown sources.

As the building neared completion, Musselman arranged for a loan amounting to $40,000, to clear up the joint adventurers' indebtedness on the building. Musselman then represented to Mather that the total cost of the lot and building was $84,000, and that Mather should execute to him a note and mortgage for $7,000 to balance their accounts, which he would negotiate to some one of the creditors, or failing in that, would carry himself. Mather visited Great Falls two or three times during construction and, from his correspondence, seems to have kept in touch with the problems arising during that period.

The building was completed in April, 1923, and in November of that year Mather came to Great Falls and remained for nearly a month. He found that Musselman had kept no books, and asked how he would make a statement as to the cost, and was advised that this could be done from the checks

which went through the bank. He requested a statement, but, was told it would be sent to him.

On January 13, 1924, Musselman wrote Mather as follows:

"Friend Bob in closed you will find statement of the cost of the Penn Apt as taking from the cheks wich wnt threw the bank, ,the three items mark x i still owe for, wich add to $8191928

"I worked study 15 months for          208072

                                                           $8400000

"Resived from R Mather......150000
"Resived from Portlan Morg
  Co. .....................400000
"Resived from R Mather sec
  mor .....................70000
"Resived from J J Mussel-
  man .....................220000          $8400000

"Now Rob I never go back on what i say my labor was worth a bout Four Thousand Dollars & each week it cost me a little change in cash; to small to scheck; Now add 5% on $84 thousands for ware & tair on tools & % & you have a bout what this building cost us.

"Just last week a man i had gave a check last March for $150, brought me the check & S & wonted to know if i was ready to pay it as he said i asked him to hold it for a fue days so i gave him the money i think that is the last bill except the three mark x on slip * * * i have been under the wather for the last ten days but am out to day * * *

"Yours respecfull J J Musselman

"P. S.   I wrote this myself ame very week but think you can get my meaning of same bin very cold since Chrstmus."

The "statement" referred to is merely an adding machine "tape list" of approximately 400 sets of figures in a continuous line, without date, note, or explanation; these figures represent sums of money totaling $81,919.28.

In answer to the above letter, Mather wrote Musselman that he thought he had "done very good."

Prior to making the statement Musselman conveyed all of his property to his wife, with the exception of the Pennsylvania Apartments, and conveyed his interest in this property to the defendants G. W. Musselman, his son, and Vivian, wife of his son, by warranty deed in which the consideration is recited as ''$1.00,'' which was in fact, all the consideration given for the property.

In 1925 Mather removed from Pennsylvania to Great Falls permanently, and shortly thereafter discovered that the $1,800 mortgage on the lot had been discharged by payment from the proceeds of the $40,000 loan. He thereupon employed an expert accountant and secured Musselman's canceled checks for comparison with the "tape list." The accountant assumed that the tape list represented the checks which went through the bank listed in the order of issue and attempted to match each item on the list to a check, and having "allocated" a check to an item, by independent investigation sought to determine whether such check was given for material or labor entering into the construction of the building. By this method it was discovered that many of the items on the list corresponded to checks given in payment of debts having nothing to do with the apartment house; many items on the list bore no relation, as to amounts, to any check which went through the bank, and a number of items apparently represented checks given but had been swelled by the insertion in the amount thereof by an additional figure; for example, three items on the list are $1,145.48, $1,111.42 and $1,000; three checks were produced, issued and paid, in the sums of $145.48, $111.42 and $100, and at some time thereafter the sum in figures on these checks had been raised by someone to the amounts found on the list, while the written amount of each check remained as originally issued. There also appear on the list 1,201.89, 1,302.60, 1,150.00, 844.11, 1,200.00 and 4,000.00, to which were "allocated" checks which seem to correspond thereto, but for the sums 201.89, 302.60, 150.00, 344.11, 120.00 and 2,000.00.

Summarizing, the accountant came to the conclusion that the tape list had been padded by the inclusion of checks having nothing to do with the building, and the raising of the amounts of other checks which were given for labor and material to the extent of $22,456.51, and that there had been added to the tape list amounts for which no checks went through the bank, which totaled $4,290.68.

· On this showing the court found that J. J. Musselman had been guilty of fraud in his representations and in making up his statement to the extent of $26,636.19, which amount should be deducted from the cost of the building as represented by Musselman, making the total cost thereof $57,252.81.

Except as hereinafter noted, the evidence fully warranted the findings of the court in this regard, and we cannot now disturb those findings. (*Ebaugh* v. *Burns,* 65 Mont. 15, 210 Pac. 892.) The proof established the fact of fraud and misrepresentations, under the rules announced in *Meagher* v. *Harrington,* supra; we believe it was clear, convincing, satisfactory and practically free from doubt.

3. However, it is asserted that the court erred in rejecting [3] and refusing to consider evidence introduced on behalf of the defendants as to items of cost which went into the construction of the building, but which were not included in the tape list.

This evidence was admitted subject to the objection that such matters constituted a special defense, not pleaded, and therefore the evidence was incompetent, irrelevant and immaterial. In finally disposing of the cause, the court sustained this objection and refused to consider the evidence. The effect of this ruling is to say that, in equity, the defendants are bound by the statement made by Musselman to plaintiff, while the plaintiff is not bound thereby; that Musselman and the defendants are entitled to credit only for proper items entered in the statement; and that, because of the fraud perpetrated plaintiff is entitled to the entire building, regardless of whether Musselman contributed to the total cost thereof or not, because

the defendants did not allege specially that other items went into construction.

The defendants denied the allegations of the complaint to the effect that Musselman contributed nothing to the construction, that the total cost of the building did not exceed $54,000, and denied that Musselman, then dead, ever made a statement to Mather of the cost of the lot and building. In order to establish the allegations of the complaint, it became necessary for the plaintiff to prove these allegations, and, having attempted to do so, defendants introduced the testimony above referred to in refutation of plaintiff's showing and under the general denials contained in their answer.

The rule is that under a general denial, a defendant may prove any fact which goes to controvert the facts which plaintiff is bound to prove to sustain his cause of action, which is inconsistent with, and thus negatives, plaintiff's cause of action. (*Mauldin* v. *Ball,* 5 Mont. 96, 1 Pac. 409; *Stephens* v. *Conley,* 48 Mont. 352, Ann. Cas. 1915D, 958, 138 Pac. 189; *Hanson Sheep Co.* v. *Farmers & Traders' State Bank,* 53 Mont. 324, 163 Pac. 1151; *Cowan* v. *Browne,* 63 Mont. 82, 206 Pac. 432.)

Counsel for plaintiff assert, in effect, that this general rule should not apply under the facts adduced, but that, fraud being shown, the property should be wrested from the wrongdoer, whether he contributed a substantial amount toward the construction or not, on the theory that "he who hath committed an iniquity shall not have equity," as a corollary to the maxim that "he who comes into a court of equity must come with clean hands," citing *Langley* v. *Devlin,* 95 Wash. 171, 4 A. L. R. 32, 163 Pac. 395, and *Gilbert* v. *Hoffman,* 2 Watts (Pa.), 66, 26 Am. Dec. 103. The doctrine may be sound as applied to the facts before the court announcing it, but it is not a question here as to whether we shall or shall not accord equity to J. J. Musselman or his successors, but the question is as to whether the plaintiff has established the necessary allegations of his complaint.

The trust which will arise from such facts as are alleged in the complaint is denominated by the authorities a "constructive trust," although it partakes of the nature of a resulting trust arising by reason of the supplying of the funds by one party and the taking of title in the name of another, but contains the additional elements of fraud and the violation of a fiduciary relation. Of this class of constructive trusts Mr. Pomeroy, in his valuable work on Equity Jurisprudence, fourth edition, section 1049, says: "Equity regards such a purchase as made in trust for the person beneficially interested, independently of any imputation of fraud, * * * because it assumes that the purchaser intended to act in pursuance of his fiduciary duty, and not in violation of it. * * * Equity jurisprudence contains few more efficient doctrines than this in maintaining the beneficial rights of property. The evidence that the purchase was made with trust funds must, however, be clear and unmistakable."

In order to raise such a trust, as it was necessary to allege [4] that the plaintiff furnished all of the funds used in the purchase of the lot and the erection of the building, as stated above, it was equally necessary that he prove by evidence, "clear and unmistakable," that he did so furnish all of the funds. (*State ex rel. Brinkman* v. *McElhinney* (Mo. Supp.), 216 S. W. 521; *Walker* v. *Bruce,* 44 Colo. 109, 97 Pac. 250; *Clary* v. *Fleming,* 60 Mont. 246, 198 Pac. 546; *Meagher* v. *Harrington,* above; *Parker* v. *Newitt,* 18 Or. 274, 23 Pac. 246; *Coe* v. *Coe,* 75 Or. 145, 145 Pac. 674.)

4. Again, counsel for plaintiff assert that, as Musselman sub- [5] mitted the tape list as an account rendered, he and his successors in interest are bound by this statement, while the plaintiff is not so bound, and that there is no distinction between an account rendered and an account stated in this regard, citing 1 C. J. 252, p. 680, and *Dodson* v. *Watson,* 110 Tex. 355, 11 A. L. R. 583, 220 S. W. 771. Counsel mistake the purport of the authorities cited.

The text in Corpus Juris considers accounts stated and clearly indicates the distinction between such an account and an account rendered, and, even as to the former, states that "while the rule that silence without objection within a reasonable time after the rendition of an account may supply the prima facie evidence of assent necessary to bind one as upon an account stated is usually laid down in comprehensive terms which seem to include both parties, it has been held that it does not apply to the party who furnishes the account; that as to him the account is not conclusive, but is open to explanation for any omission or mistake in the absence of facts creating an estoppel."

In the *Dodson Case* the court was dealing only with an account stated, and even then held that such an account is merely prima facie evidence of correctness, dispensing with proof, but not creating an estoppel, and but casts upon the opposing party the burden of disproving its correctness. The question before the court was as to the correctness of the trial court's ruling in refusing to instruct the jury that the defendant would not be entitled to credits omitted from an account stated, unless their omission from "the written instrument" was by mutual mistake; it was held that no error was committed.

This court has likewise held that even an account stated is but strong prima facie evidence of its correctness and does not create an estoppel (*Johnson* v. *Gallatin Valley Milling Co.,* 38 Mont. 83, 98 Pac. 883), and in *Martin* v. *Heinze,* 31 Mont. 68, 77 Pac. 427, the distinction between an account stated and an open unsettled account in this regard is pointed out.

Whereas an account stated partakes of the nature of a contract between the parties, and, in order to prove omission from or mistakes in the statement, they must be pleaded, here we have merely an open and unsettled account between the joint adventurers, on which Musselman rendered an account now challenged by plaintiff, and as, in the case of any open account, defendants were entitled, under their general denial, to show any facts tending to defeat plaintiff's prima facie case.

The plaintiff having introduced evidence to establish his allegations that Musselman contributed nothing toward the purchase of the lot and the erection of the building, the defendants were entitled to introduce evidence to the effect that Musselman did contribute toward the cost, and that the total cost was in excess of the amount claimed by the plaintiff and in excess of the amount contributed by plaintiff and borrowed from the mortgage company, as directly contradictory of the showing made by plaintiff. The court therefore erred in sustaining the objection and in refusing to consider the evidence adduced as to other items of cost which went into the building.

5. Plaintiff's allegation is that the total cost of the lot and [6] building did not exceed $54,000. His proof showed that the legitimate items on the tape list did not, even with the addition of the amount inadvertently omitted by the court, as hereinafter pointed out, total $62,549.62, the amount contributed by Mather and secured by mortgage on the premises, and therefore, in order to overcome the prima facie case made by plaintiff, it was incumbent upon the defendants to show substantial amounts contributed by Musselman in excess of the sum of $62,549.62. Testimony as to the items hereinafter considered was adduced, and in corroboration thereof, and as a basis for determining the probable cost of constructing the building, defendants employed the contracting firm of Lease & Legland to go over the building and estimate the cost of replacement. Their estimated cost of the building, itemized with particularity, totaled $83,906.50, and by adding the cost of the lot, or $3,247.50, the total cost of the building and lot is $87,154, or more than $3,000 in excess of what Musselman claimed to be the total cost. But it appears from the record that Musselman advised Mather that the $84,000 cost did not include furniture and fixtures, and it was shown that these amounted to $8,700, which was paid from rent receipts, so that the estimated cost would be approximately $78,450.

Counsel for plaintiff contend that this estimate was improperly admitted and should not be considered for any pur-

pose. Musselman was dead; he kept no books; the estimate was made by experts of unquestioned ability, after a physical examination, careful measurements, and with full knowledge of the cost of materials and labor at the time the building was constructed; it was therefore properly admitted (*Kennett* v. *Katz Construction Co.,* 273 Mo. 279, 202 S. W. 558), and was the best evidence which could then be produced (*Landon* v. *Morehead,* 34 Okl. 701, 126 Pac. 1027; *McKeown* v. *Brown,* 167 Iowa, 469, 149 N. W. 593). The "estimate" will therefore be considered for the purpose of determining whether the testimony concerning items claimed to have gone into construction could reasonably have been supplied by Musselman.

6. Starting with the amount the court found to be the total of all legitimate items appearing on the tape list, or $57,252.81, we find that this amount was arrived at by deducting from the $84,000 those items which the court found to be fraudulent entries and padded entries in the list, totaling $22,456.51, and items totaling $4,290.68, which the court found appeared on the list, but for which there were no corresponding checks passed through the bank.

(a) In deducting the last amount, the court inadvertently overlooked the testimony of plaintiff's accountant when he said that, after totaling these items, it was discovered by him or Mather and communicated to him, that two items included in the total, to-wit, the sum of $1,082.99 and the sum of $1,890, were payments on the lot, and should be deducted from the $4,290.68. Counsel for plaintiff contend that these items were thereafter allowed to defendants, but it is clear from the court's findings that they were not so credited, as it required the deduction of the full $4,290.68 in order to secure the result arrived at by the court. There should therefore have been added to the total declared by the court the sum of $2,972.99.

(b) The checks produced numbered 570, as against approximately 400 items appearing on the tape list; many of the additional checks were clearly shown to have been given for material and labor used in the building, as they corresponded

to checks admittedly carried forward to the tape list. For example, it is apparent that certain classes of workmen employed received $38.50 per week, while other classes received $60 per week, and Musselman was engaged in no other construction during the period covered.

While the tape list contained twenty-nine items of $38.50 each, and six items of $60 each, among the checks were shown thirty-nine checks for $38.50 each, and eleven checks for $60 each. Again, four checks for $100 each were produced, while there was no item of $100 in the list and but one check was credited, it being allocated to the $100 item, as above stated. The checks given for items shown to have gone into the construction, not listed on the tape, total $2,184.51.

(c) There is, then, an item of $150 which Musselman paid, according to his report to Mather, without being included in the tape list, and which is undisputed.

(d) Further, it is clear from the evidence that the Cascade Electric Company received in all $3,634.94 for work on the building, but in estimating the cost, by plaintiff's testimony, the court allowed but $2,641.10, and the difference, or $993.84, should have been credited.

(e) The evidence discloses that cut stone over the entrance to the apartment was furnished by Grover & Louchers for the sum of $183, and the only credit received on the building therefor was the sum of $100; there should have been a further credit thereon of $83.

(f) It was shown that Musselman paid insurance premiums on the building during construction amounting to $139.25, which was not taken into consideration by the court, and this further credit should have been added to the cost of construction.

(g) The most strenuous objection to the allowance for items claimed by the defendants is launched against the testimony concerning materials claimed to have gone into the construction, but not purchased for that purpose. Prior to commencing the work on the building, Musselman wrote Mather that he

had materials on hand, including lumber and other necessary items, which he would use; again he wrote Mather that he could get sand, gravel, etc., from parties indebted to him. As he had been in the contracting business for years, it is reasonable to suppose that he would have an accumulation of such materials. He placed a value on these materials of $10,000. Later he advised Mather that he had constructed all window frames to be used from material on hand.

Plaintiff contends that, had Musselman in fact had such material on hand, he would have taken credit for it on the tape list, and that he did not do so unless the item be concealed in the alleged fraudulent items entered on the tape list. This latter surmise may be correct. The record discloses that, during the construction and in aid thereof, Musselman borrowed $16,000 from the bank on his personal credit, and on receipt of the proceeds of the $40,000, he had $10,000 of this indebtedness paid out of such proceeds. Here, had Musselman been alive and testifying, the payment to him for the $10,000 worth of material might readily have been explained in such manner as to reflect no discredit upon Musselman.

Defendant G. W. Musselman testified that, before the building was erected, he went over the material on hand with his father, and that they then estimated its value at $10,000. On cross-examination he was asked to itemize the materials, and place separate values on each kind of material on hand; this he could not do to an extent which would show specific items of material, with values totaling the sum of $10,000, and, to some extent, he became confused, and his testimony was, in certain particulars, contradictory. He explained this difficulty by stating that some years had elapsed, and that he had not given the matter of particulars much attention at the time. Counsel contend that his testimony was discredited by his statements made in a deposition taken some time before the trial, but we see little difference in the testimony given, except that, on cross-examination at the trial, he was forced to go more into detail.

Again counsel contend that the court discarded the testimony of this witness as not entitled to credit, but the record does not bear out this contention. The court did not hear the testimony of the witness, nor see him on the stand, and the amended findings dispose of this testimony by the statement that there was "some testimony" as to the material on hand, but that it was "objected to by the plaintiff as incompetent, which objection is hereby sustained." We have heretofore held that the ruling was erroneous. It is significant that the referee, who did hear the testimony and who saw the witness on the stand, gave credit in his findings for the full $10,000. However, the burden rested upon the defendants to overcome the prima facie case made by the plaintiff by a preponderance of the evidence, and, in justice to the plaintiff sought to be defrauded by a padded statement of the cost, only those items which were clearly shown to have gone into construction should be considered, and matters of doubt should be resolved against the defendants.

Counsel for plaintiff concede that G. W. Musselman did itemize materials valued at $5,210, and for the purpose of this discussion, we will accept these figures. Counsel, however, assert that the proof of materials purchased from others precludes allowance of at least a part of this amount; they take the items of lumber included in the Lease & Legland estimate, and then show that the accounts of the St. Anthony & Dakota Lumber Company practically balance this total amount.

It does not appear from the record what materials were furnished by this company; the only reference to materials furnished by it is that a certain item, which was disallowed because it went to other property of Musselman, was for lumber. We may assume that this company was dealing in lumber, but it is not unreasonable to assume further that it, in common with other lumber companies, also dealt in cement, tiling, roofing and many other items which went into construction, and there is nothing in the record to disclose from whom these

[79 Mont. 566.]

items, running into thousands of dollars, were purchased; it may as well be that much of this material came from the St. Anthony Company, leaving a wide margin for lumber on hand. There is nothing in the record to show that the sand and gravel used was paid for, although one Gray, who did the excavating, was paid for hauling sand and gravel to the premises; this may well have been additional material on hand. In fact, taking all of the materials listed in the Lease & Legland estimate, and deducting all payments to persons or firms who *may* have furnished materials of this nature, there would be room for the allowance of the entire claim for a credit of $10,000; but we need not now consider an excess over the sum mentioned above.

(h) The Lease & Legland estimate provides for a four per cent architect's fee, and the record discloses that Musselman had plans and specifications for the building, though they were not available at the trial; that a man from an architect's office was with Musselman while the plans were made, and it would seem reasonably clear that Musselman could not have prepared such plans and specifications as were submitted to the company which made the loan on the building, and upon which, with a personal inspection, that company estimated the value of the building at $90,000, and thereupon approved a loan of $40,000.

Musselman advised Mather in advance that they would have to have plans drawn and incur a larger fee for this purpose and for inspection than four per cent, and Mather made no objection thereto. However, the evidence does not disclose that Musselman paid for the plans or for inspection, and we will not consider the architect's fee.

(i) The Lease & Legland estimate includes a contractor's fee of ten per cent of the cost of construction. It seems clear from the record that Musselman was to be allowed compensation as though he constructed the building for strangers; but Mather testified that "at one time" Musselman told him he would

charge $10 a day for his work, and in the tape list Musselman claimed, and was allowed, an amount approximately equaling $10 per day for the working days within the period of construction. It may be ·that Musselman and his successors in interest are now bound by his acts, and that a contractor's fee should not be figured in the cost of construction; but it is not now necessary to determine this question.

On the theory on which the complaint was drawn and the case was tried, and indeed the only theory on which plaintiff could prevail under his present pleadings, the defendants were not required to go into detail as to the amounts contributed by Musselman, nor to show all of the items of cost supplied by Musselman; all they were required to do, in order to overcome the prima facie case made, was to show that Musselman contributed a substantial amount to the construction in addition to the amount furnished by Mather.

Disregarding, then, the items of architect's fees and contractor's fees, and figuring the materials on hand at $5,210, we find that the cost of construction, with cost of the lot, totals $68,977.40, or approximately $6,800 in excess of the amount contributed by Mather and the $40,000 secured by their joint mortgage note. This is certainly a substantial amount shown to have been furnished by Musselman, while in an appropriate action this amount might be materially increased or decreased by proper testimony. It is therefore apparent that the court erred in constructing a trust from the evidence adduced, and decreeing that the defendants should convey their entire interest in the premises to the plaintiff. (*State ex rel. Brinkman* v. *McElhinney,* above.)

We are, however, loath to direct the dismissal of this action as insurmountable difficulties might arise in attempting to bring another action, in which the rights of the parties could be determined, and to leave the parties in the position in which we find them would be inequitable and unjust to the plaintiff.

The judgment is therefore reversed and the cause remanded

to the district court of Cascade county, with directions to permit amendments to the pleadings, under which the parties may properly present the questions to be determined, and, on a retrial under such amended pleadings, to determine from the record, as heretofore made, supplemented by such additional testimony as either party may see fit to introduce, the proper credits to be given and the total amount which J. J. Musselman contributed to the purchase of the lot and the construction of the building, and, by comparison with the amount contributed by the plaintiff, to determine the comparative interests of the parties in the premises, and thereupon to enter judgment and decree fixing the rights of the parties and commanding the defendants to convey to the plaintiff such an interest in the premises as will fully compensate him for the amount which he contributed in excess of that contributed by J. J. Musselman, or, if they so elect, the defendants may pay to the plaintiff such an amount as will equalize the contributions of the joint adventurers, and thereafter the plaintiff and the defendants shall hold equal interests in the property.

*Remanded, with directions.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MYERS, STARK and GALEN concur.