275 P.2d 960

**F. C. KEANE and Eugene F. McCann, Plaintiffs-Respondents,**

**v.**

**A. F. McFEE, Defendant-Appellant.**

**No. 8122.**

Supreme Court of Idaho.

Oct. 29, 1954.

Harold S. Purdy and Robert V. Glasby, Coeur d'Alene, for appellant.

· James P. Keane, Wallace, for respondents.

GIVENS, Justice.

Respondents sued on an alleged account stated as of March 14, 1951 for $11,603.23 for legal services rendered appellant by respondents from April 1946, evidently to the date of the account; and $300 a month retainer from March 15 to September 15, 1951; the balance for both, on the date of suit November 12, 1951, being $7,482.28; asking for a lien on a check for $9,289.66 made by one Munter payable to respondents and appellant, the claimed proceeds of litigation in the State of Washington transacted by respondents and Munter for appellant, said check being placed by respondents with the clerk of the trial court when suit was filed.

Appellant's answer denied there was an account stated, or that he owed respond-

ents $7,482.28 or any sum in excess of $430.-51, which he deposited in court for respondents' acceptance; and as affirmative defense admitted employing respondents as counsel, but denied any agreement as to the value of such services, "but accepting plaintiffs figures said defendant has paid to said plaintiffs without questioning plaintiffs accounting, the sum of $24,982.75."

Testimony by respondents and Irene Vermillion, their secretary from May 1, 1944 to December 30, 1950; detailed conferences with appellant, checking of accounts, books, records, reductions, concessions and readjustment of the parties' respective claims, thus culminating:

"Q. Handing you (Mr. McCann) Plaintiffs' Exhibit No. 1 (detailed debits and credits with pencil notation thereon of the elimination of $2700.00) for identification, will you state what it is? A. That is a memorandum of the figures—the debits and credits of the account between Keane and McCann and A. F. McFee which was agreed upon at the first conference that I have been discussing.

"Q. Is it—is there any writing on plaintiffs' Exhibit No. 1 that you have heretofore testified to? A. Yes, there is a pencil notation after one of the items checked which had been paid to us by Mr. McFee 10/5/50.

* * * * * *

"Q. At the time that this adjustment was made was there any agreement reached between you, Mr. Keane, and Mr. McFee as to the balance due. A. Yes, there certainly was. The figure that is shown on Plaintiffs' Exhibit No. 1, the last typewritten figure, is so labeled.

"Q. Did Mr. McFee promise to pay this? A. The inducement for our agreeing to take less than the $500.00 a month we felt the services were due, or one of the inducements at least, was that he was to pay it up in a very short period of time.

* * * * * *

"Q. Handing you (Mr. Keane) Plaintiffs' Exhibit No. 1 for identification, could you state what that is? A. That is a statement for services rendered by McCann and myself and other incidental expenses together with certain credits given Mr. McFee. It was made up after—after completion of this discussion, which I think occurred on Sunday March 11th.

"Q. And at whose direction was this typewritten statement made? A. Well, Mrs. Vermillion, who at the time was acting court reporter and was no longer employed by either Mr. McCann or myself, and Mrs. Poska had gone over a number of figures and made a bunch of notations from those figures, and she made up this statement pursuant to her records or subject to her records that she had there in the office

and certain corrections or alterations made in it by Mrs. Poska.

"Q. Were you present when this statement was prepared? A. I don't think I was present when it was prepared.

"Q. Could I ask you further—there is certain writings on Plaintiffs' Exhibit No. 1. Could you state whose writing that is? A. That is mine.

"Q. Did Mr. McFee ever receive a copy of Plaintiffs' Exhibit No. 1? A. I gave Mr. McFee a copy or the original, I imagine. I imagine I probably gave him the original—I don't know—of that statement. Some of it was probably on about the 13th or 14th of March.

"Q. Did you see Mr. McFee after that date? A. Yes, I did.

"Q. Where did you see him? A. Saw him in my office again. Mr. McCann was also called over to the office.

"Q. Who called him? A. I did.

"Q. Will you relate what conversation took place at that time? A. There was a complaint on Mr. McFee's part with reference to some nine months that he was originally charged with during the *month* of '46. He claimed that Mr. Horning had acted and had billed him—I don't know whether he said 'paid him for his services rendered during the year 1946.'

"Q. What took place then? A. Mr. McCann was agreeable again to cutting the nine months in '46 for—always with the proviso that the account be straightened out at once.

"Q. By straightened up * * * A. Paid.

"Q. Did Mr. McFee state that he would pay it? A. Yes, he stated definitely that he would pay it within a matter of thirty or sixty days.

"Q. Did he pay it? A. He did not, save and except credits were made on the account.

"Q. Directing your attention to the 15th day of March, 1951, did you receive any money on this balance that was struck? A. $2000.00 on that * * *

\* \* \* \* \* \*

"A. I say there was $2000.00 paid on it under date of March 15th, 1951.

"Q. Were any notations made by you in regard to the $2700.00 which you deducted from the balance as originally shown? A. If you will show me the statement I will explain those notations to the Judge.

"Q. Plaintiffs' Exhibit No. 1. A. Yes. Now, at that time I wrote upon Mr. McFee's copy of the statement 'Adjustment, April, December, 1946 $2700.00' and then subtracted that amount from the balance of $11,603.26.

"Q. Was that made in the presence of— A. That was made in the presence of Mr. McFee and his copy was also given to him with that notation in pencil made by me on it.

\*    \*    \*    \*    \*    \*

"Q. Directing your attention, Mrs. Vermillion to on or about March 11th, 1951, do you recall anything that occurred on that date? A. Yes.

"Q. Would you relate that? \*  \*.

"Q. Would you relate what occurred on that date? A. I was called to the office, which was on Sunday, and I went up to the office in the Gyde-Taylor building. Mr. Keane, Mr. McCann, Mr. McFee, Mrs. Poska and Mr. Emacio were there, and I made up a list of charges and credits in the Keane & McCann account for Mr. McFee and Mr. McFee's account and they checked over the credits at that time.

"Q. Did you render a statement prior to that date? A. No.

"Q. You had not? A. Not that I recall.

"Q. And who went over the credits and debits with you? A. I believe everyone checked over them against their ledger sheets that they had.

"Q. 'They had'? Who do you mean? A. That is Mr. McFee, Mrs. Poska and Mr. Emacio.

"Q. And did you make any notations of that meeting? A. I made some additional credits on the list that I had that we didn't have and also they deducted some things that they had credited against Mr. McCann and Mr. Keane that we didn't have too.

"Q. Handing you Plaintiffs' Exhibit No. 1, will you state what that is? A. That is a statement that was made up a few days after that Sunday listing the charges which were against Mr. McFee and credits which had been paid by Mr. McFee to Mr. Keane and Mr. McCann.

"Q. And who drew this up? A. I typed them.

"Q. You did all the typing—all the typing on there was done by you, is that correct? A. Yes, that is correct.

"Q. And from what source did you obtain the typewritten information that is on Plaintiffs' Exhibit No. 1? A. From work sheets we had in the office and other information Mr. Keane gave me the day that I typed this up.

"Mr. Keane: I offer Plaintiffs' Exhibit No. 1 in evidence.

"Mr. Purdy: We have no objection.

"The Court: It will be admitted."

There was evidence to the effect appellant made payments on this account from time to time, without objecting to its correctness.

There was extensive cross-examination of respondents as to various phases of the negotiations and other typewritten statements from respondents' and appellant's files of accounts, none of which was shown or claimed to have been agreed upon, evidently presented to impeach Plaintiffs' Exhibit No. 1 or to obfuscate respondents' showing that said Exhibit was the correct and final account stated.

Appellant was not asked and did not categorically, or otherwise, deny the testimony of respondents above set forth, that on March 14, 1951 he accepted and agreed to the account as correct. He was cross-examined as to various legal controversies in which respondents or other attorneys putatively rendered services to him, eliciting no definite monetary charges, debits or credits. Appellant, largely through the testimony of Mrs. Cantrell, his bookkeeper, from her examination of his books and the account as presented in Plaintiffs' Exhibit No. 1 and some 24 canceled checks payable to respondents—one to appellant's Company with a notation thereon 'Cash to F. C. Keane'—and drawn by or on behalf of appellant or his Company, sought to show the account as tendered and claimed to be stated and agreed upon by respondents was incorrect. Mrs. Cantrell thus summarized her examination:

"Q. But it was after March 14th? A. '51, yes.

"Q. Now, based on all of these, did you make a final analysis of the account stated? A. That is it.

"Q. All right. Now what does that show? The information that you used to get that was the account stated? A. (It) Was the statement that Keane & McCann that Keane gave me in his office some time prior to the filing of the complaint.

"Q. Just explain to the Court how you arrived at those figures on there,— what you did?

* * * * * *

"A. I took the statement for services rendered and expenses incurred that Keane & McCann had submitted to me or to Mr. McFee, and set that up. I went through all the records and files —there wasn't any account actually set up for Keane & McCann in Mr. McFee's books and it took quite a lot of digging and the only thing I could do was to go through all the canceled checks until I found one made out to one of the two parties. When I found that I laid it aside. When I got through I totalled all those canceled checks. I took the credits that Keane & McCann had allowed both on the statement that he had given me and a later statement which I don't think he would refute because he had to use that to arrive at his complaint. I used those credits and added those

to the canceled checks; received $24,-931.75 as total payment made by McFee to Keane & McCann against a balance due Keane & McCann of $19,663.26 which I don't think they will dispute.

"Q. Now, what does that show then? That the account has been paid? What does it show? A. Shows a balance due McFee of $5268.49. I didn't at that time, allow anything for the Bismarck case. Shall I bring this up?

"Q. Well, suppose you allowed in your account for the Bismarck matter and for the Helena matter—how would the account stand then? A. That would be taking $5750.00 from the balance due McFee of $6118.49 and that leaves a total due McFee of $368.49.

"Q. And that is giving them credit for everything they have claimed?
*    *    *    *    *    *

"Q. What credits does that show? A. I show here only credits that is—prior—I show here total payments made by McFee; I used canceled checks and credits Keane & McCann had allowed themselves."

and thus related a conversation with respondent Keane:

"Q. Yes. Now, Mrs. Cantrell, after you got the first statement from Mr. Keane and after the 14th of March, 1951 did Mr. Keane ever admit to you that there was any errors in that account?
*    *    *    *    *    *

"A. Yes, he did.

"Q. Now, what were—what was the objection that they had upon that. I will ask you to read that to refresh your memory. A. I found some more checks that Mr. McFee had paid to Mr. Keane and I showed him those checks and he said there must be some mistake in the statement. That is not a quote.

"Q. But was he willing to accept those figures that you found?
*    *    *    *    *    *

"Q. Well, did he accept the figures—did he make any statement concerning that? A. He said he would like to have a couple days to check his records, and after two or three days he came back and said his records were in such shape that he didn't know for sure whether my account was correct or his account was correct?"

All this evidence on behalf of appellant, including the checks was objected to by respondents on the ground the answer consisted only of a general denial and appellant's evidence did not deny the account stated had been agreed upon March 14, and the answer did not specify the items in the account stated which were incorrect or which items appellant sought to surcharge, citing in support thereof, Naylor & Norlin v. Lewiston, etc., Ry. Co., 14 Idaho 789, at page 804, 96 P. 573; Owens v. Cohlman, 182 Okl. 380, 78 P.2d 292; Parsons v. Segno, 187 Cal. 260, 201 P. 580, and Mather

v. Musselman, 79 Mont. 566, 257 P. 427, which to some extent announced such doctrine and to which may be added Reid v. Topper, 32 Ariz. 381, 259 P. 397, at page 400, the court there stating:

"It is of course the general rule of law that a stated account is not conclusive, but simply affords strong presumptive evidence which may be rebutted by showing either fraud or mistake. 1 C.J. 709. It is also true that when a party seeks to open, surcharge, or falsify an account, he must specifically allege the grounds therefor and show what items were improperly inserted or omitted. General averments of fraud or mistake are insufficient. (Cases.)"

Appellant urged the answer denied the account and affirmatively alleging no more than $430.51 was due, entitled appellant to make such showing.

The court conditionally admitted the evidence, reserving his ruling and ultimately held with respondents and rejected the exhibits and testimony thus introduced by appellant, and found an account stated was agreed upon as of March 14, 1951 in the sum of $11,603.23 with an agreement to pay retainer fees of $300 from March 15, 1951 to September 15, 1951; that various payments were made by appellant upon the account stated amounting to a total of $7,621.-75, leaving a balance due as of the date of the trial of $1,981.51 on the account stated,

$1,800 as retainer fees from March 15, 1951 to September 15, 1951 and $831.86 interest thereon, and giving respondents a lien upon the Munter check, deposited with the clerk.

At the time the court rejected the testimony offered by appellant because of the insufficiency of the answer, appellant asked leave to amend, as follows:

"Defendant alleges that plaintiffs' purported account stated has erroneously and incorrectly excluded certain specific items to defendant's detriment as shown by Schedule 'A' which would be the exhibit that was introduced.

"And further, defendant alleges that defendant has kept full, true and correct accounts and records of payment which cannot be reconciled with the account stated rendered by plaintiffs. * * *"

The amendment was denied because appellant did not show he did not have the information he sought to introduce under the amendment, prior to the time the amendment was offered.

Only the first paragraph of the amendment merits attention. This amendment did not change the initial and fundamental issues in the case; namely, by the general denial that an account stated had been rendered, and second, under the affirmative defense the contention of appellant that he did not owe the amount claimed by respondents.

No claim or showing of surprise or request for additional time or the imposition of terms if the amendment were allowed, were made. It may be conceded that Fralick v. Mercer, 27 Idaho 360, at page 366, 148 P. 906, tends to support the reason given by the trial judge for denying the amendment. This thought, however, was in effect disregarded or modified in Powers v. Security Savings & Trust Co., 38 Idaho 289, at page 296, 222 P. 779, approved in Todd v. City of Hailey, 45 Idaho 175, at page 182, 260 P. 1092, and in essence, Hall v. Boise Payette Lbr. Co., 63 Idaho 686, at page 692, 125 P.2d 311.

Since there was no showing of surprise or prejudice or request for time or the imposition of terms, the amendment was improperly rejected on the ground stated. Hoy v. Anderson, 39 Idaho 430, at page 435, 227 P. 1058. Idaho Trust Co. v. Eastman, 43 Idaho 142, at page 147, 249 P. 890, is readily distinguishable from the situation herein.

The weakness of appellant's position is largely because he did not testify or offer any direct evidence he had not agreed to the account stated March 14, but merely sought to surcharge various items thereof. On the other hand, he denied in his answer an account had been rendered or agreed upon and if his further affirmative defense were true, it was in the nature of a confession and avoidance, 71 C.J.S., Pleading, § 154, p. 338, to the effect he owed only the amount specified in the answer. When the answer was filed, therefore, respondents knew it was appellant's position he did not owe the balance claimed in the alleged account stated.

While the various items were not detailed in the answer, the total amount which appellant conceded he owed and the total payment which he contended he had made thereon, were set forth.

The requested amendment refers to Schedule "A". We have been unable to find any Schedule "A" referred to or set forth in the transcript or among the exhibits. From the colloquy which took place at the time the amendment was rejected—

"Mr Purdy: Only that we would like to show the exhibit that is in shows that there is evidence that the defendant has never been given credit for certain payments that have been made prior to the time that the account stated was gotten up. And, second, that there has been sums of money paid after the account stated in the sum of about $3000.00 or approximately, that the defendant has never been given credit for.

"The Court: There isn't any question about those items. If you have any proof of any such items after the account stated they will be admissible.

"Mr. Purdy: But as to the other we desire to have the amendment show that the account as stated or plaintiffs' purported account stated has erroneously excluded certain specific items.

"The Court: Is it possible for you to make a showing that this information was not known to the plaintiff or the defendant, rather, at the time he conferred with you about this matter prior to the filing of the answer?

"Mr. Purdy: Yes, I believe that we can show in this—I don't know as we can show it prior to the time of filing the answer because the answer was prepared by Mr. Fanning, but I don't hold him responsible for that. That is my error as much as his, but until all of the books, records and these checks had been accumulated together, it took time to do that and, possibly we could have filed an amended answer with the permission of the Court prior to the time of this trial but equity would certainly require the defendant to have the right to show payments that he has made to these plaintiffs on the account.

"The Court: This will probably seem a little harsh to you, Mr. Purdy, but I am going to deny your motion to amend because I feel the defendant has been in a position where he could have known all this—all these facts long before now. To come into Court at this stage of the proceedings and move to amend an answer and set up this defense, I feel is not permissible. I will deny the motion to amend.

"Mr. Purdy: And we take exception to that ruling.

"The Court: It will be noted in the record. Now, as a part of the order of the Court, defendant's Exhibit No. 6 which was admitted yesterday with reservations pending the ruling upon the question that had been raised by the plaintiffs, will now be rejected because it contains several—many items that are listed prior to the time of the alleged account stated.

"And as to Defendant's Exhibit No. 7, those checks which are dated prior to March 14th, 1951, will be rejected. All those dated subsequent to that will be admitted.

"Mr. Purdy: Now, if the Court please, I understand the ruling is that, even though defendant's Exhibit No. 6 shows payments *A*fter March 15th, 1951, that the entire exhibit has been rejected?

"The Court: That is right. You can show those payments—you have the checks and other matters, Mr. Purdy. If, because of this ruling, you need additional time to get hold of those original records from which that exhibit was taken, I will be glad to grant that additional time.

"Mr. Purdy: There was an exhibit— a rejected exhibit yesterday—if we could get that and copy that.

"The Court: No. 6?

"Mr. Purdy: We would like to see No. 6—we would like to see the one—1927 exhibit—I think it is No. 4 or 5.

"The Court: Whichever it is, you may withdraw it from the files temporarily.

"Mr. Purdy: We have withdrawn, with the Court's permission, Defendant's Exhibit No. 4 and Plaintiffs' Exhibit No. 6.

"The Court: Do you need these checks? Exhibit 7?

"Mr. Purdy: I have a list of those." it may be inferred that Schedule "A" refers to Defendant's rejected Exhibit No. 7, containing 18 checks as indicated above, payable to respondents directly or indirectly, prior to March 14, 1951 and six checks after that date, those prior totaling $10,600 and those afterwards totaling $6,000.

A further comparison between Plaintiffs' Exhibit No. 1 as to cash and credits paid by McFee and these checks, shows cash and credit on Exhibit No. 1 as follows:

| | | |
|---|---|---|
| May 10, 1950—check to McFee, NSF | $160.00 |
| " " " — " " " " | 200.00 |
| March 8, " — " " " " | 35.00 |
| July " —IOU, Keane to Samuels | 250.00 |

for which there are no corresponding checks in Exhibit No. 7. On the other hand, in Exhibit No. 7, there are checks as follows:

| | | |
|---|---|---|
| Oct. 8, 1948—check to F. C. Keane.... | $1,000.00 |
| Oct. 29, " — " " " " " .... | 1,000.00 |
| Jan. 26, 1949— " " Eugene McCann | 500.00 |
| Dec. 14, 1950— " " F. C. Keane.... | 500.00 |

for which apparently no credits appear on Exhibit No. 1.

▉ Pleadings are to be liberally construed. Fox v. Cosgriff, 64 Idaho 448, at page 453, 133 P.2d 930; Paulsen v. Krumsick, 68 Idaho 341, at page 347, 195 P.2d 363; Parsons v. Kootenai Rural Electrification Ass'n, 71 Idaho 510, at page 514, 234 P.2d 828; Bekins Moving & Storage Co. v. Maryland Cas. Co., 72 Idaho 493, at page 496, 244 P.2d 1100. Therefore, while the rejected amendment is inept and not clear, the original answer did deny an account stated had been tendered and did deny the amount of indebtedness, conceding a lesser amount.

"* * * even in cases where an account stated exists, and the account is

shown to contain errors of considerable extent in number and amount, or which extend over a long period of years, the account will be opened, justice requiring a restatement of the account. The rule is stated in 1 C.J. 721, §§ 373, 374, as follows: 'where accounts which are impeached as erroneous are shown to contain errors of considerable extent in number and amount, or which extend over a long period of years, the accounts will be opened whether the errors were caused by mistake or by fraud, and the party will not be confined merely to surcharging and falsifying. But in such case the errors must be shown to be so numerous that justice cannot be done without restating the account.'" Tolmie v. San Diego Fruit & Produce Co., 57 Idaho 631, at page 639, 68 P.2d 61, at page 64.

A case somewhat parallel to the record herein is Fee v. McPhee Co., 31 Cal.App. 295, 160 P. 397, and the extended discussion therein is pertinent herein and is influential in contemplating the interpretation placed upon the amendment should not be too restrictive, and it was sufficient to justify the allowance of the rejected amendment by appellant.

■ This conclusion is further strengthened by the proposition that under a general denial, a defendant may show any facts and circumstances showing the improbability of having agreed to the account as rendered and claimed to be an account stated. Woodson v. Leo-Greenwald Vinegar Co., Mo.App., 272 S.W. 1084; State ex rel. Woodson v. Trimble, Mo., 287 S.W. 626; Steinmetz v. Grennon, 106 Or. 625, 212 P. 532; 1 C.J.S., Account Stated, § 63 bb, p. 748.

■ The ultimate issue in this case is, of course, what—if anything—appellant owed respondents for legal services and in view of the somewhat confused condition of the record, we believe the amendment should have been allowed conditionally, on appellant's alleging by amendment clearly and definitely what specific items in the claimed account stated, shown in Plaintiffs' Exhibit No. 1, he seeks to surcharge.

■ Appellant contends respondents had no lien upon the Munter check because, within the purview of Section 3-205, Idaho Code, the services for the litigation in Washington, the basis of the Munter check, were not involved in the account stated and also, because the check was surrendered to the clerk of the court. Respondents urge an attorney has, in addition to the statutory charging lien, a retaining lien at common law upon anything of value belonging to the client or for the client, coming into the attorney's possession, as security for general services. In re Heinsheimer, 214 N.Y. 361, 108 N.E. 636; Robinson v. Rogers, 237 N.Y. 467, 143 N.E. 647, 33 A.L.R. 1291; Prichard v. Fulmer, 22 N.M. 134, 159 P. 39, 2 A.L.R. 474; and no authority has been

cited to the contrary. Depositing the check with the clerk of the court was not such release of possession by respondents as to destroy their lien thereon. American National Bank v. Funk, 68 Okl. 169, 172 P. 1078, L.R.A.1918F, 1137. Appellant further argues the lien should be allowed only to the extent of the judgment and the overplus of the check turned over to appellant. In view of the reversal of the case and it being problematical as to the amount that may be found to be due, the present custody of the check with the clerk of the District Court will not be disturbed and will remain there until final disposition of this case. Judgment as to respondents' lien is, therefore, affirmed.

As to the amount found due respondents, the judgment is reversed and the cause remanded for a new trial in accordance with the opinion herein. Each party to pay their own costs.

PORTER, C. J., and TAYLOR, THOMAS and KEETON, JJ., concur.