[Filed January 6, 1890.]

J. B. PARKER, APPELLANT, *v.* MARY A. NEWITT, RESPONDENT.

The principle is well settled in equity that when one purchases an estate and pays for it and takes the title in the name of another, or when one purchases an estate with the money of another and takes the title to himself, there arises by operation of law a resulting trust in favor of the owner of the money.

This is founded upon the presumption that the party paying for the estate intended it for his own benefit; but this presumption does not arise in some excepted cases, where, by reason of the relation of the parties, the payment of the consideration may be supposed to be a gift to the nominal purchaser.

Whether a purchase in the name of a wife or child is an advancement is a question of intention, though presumed in the first instance to be a provision or settlement.

A resulting trust may be established by parol evidence, but the law for the safety of titles requires that the proof shall be of the most reliable and satisfactory kind. The *onus* of establishing a resulting trust rests upon him who seeks its enforcement, and before a court of equity will be warranted in making a decree therefor the evidence must be clear, definite, and free from doubt.

APPEAL from the circuit court for Multnomah county.

*Johnson, McCown & Idleman*, for Respondent.

*Emmett B. Williams*, for Appellant.

LORD, J.—This is a suit in equity brought by the plaintiff to establish a resulting trust, in his favor, to certain lots of land in the city of East Portland, alleged to have been purchased by his wife, Mary J. Parker, now deceased, with money belonging exclusively to him, and that the deeds to the same were taken in her name without his knowledge or consent or authorization. The defendant, Mary A. Newitt, is the daughter and heir of the said Mary J. Parker, by a former husband, and the defendant, J. W. Newitt, is the husband of the said Mary A. Newitt. The complaint shows, in respect to the property in dispute, that there were three different transactions, and that in each of them the deeds were made and taken in the name of the wife, the said Mary J. Parker.

In substance, the defense is: first, that the property in controversy was bought with money owned by and belonging to the said Mary J. Parker; and, second, that the deeds to the same were executed and delivered to her with the full knowledge, consent and direction of the plaintiff. After issue was joined the cause was referred to T. Hume, Esq., to take the testimony and report the same back to the court, with his findings of fact and conclusions of law. It is enough to say, upon the coming in of the report, the findings, both of law and fact, were for the plaintiff, and upon motion to confirm the same, after argument by counsel, the court confirmed said report, and decreed that

the defendants execute to the plaintiff deeds for any inter-
est they might claim in said property, etc.

From this decree the defendants appeal to this court.
The question to be determined is whether, from the nature
of the different transactions at the times the several deeds
were executed and delivered in the name of the wife of the
plaintiff, there arose a resulting trust in his favor in such
lands, or whether such deeds, when so executed and deliv-
ered, were intended by the plaintiff as a settlement or
advancement to his wife; or, more briefly, whether, upon
the facts, the wife held the property in trust for him or in
her own right as the intended beneficiary of it. The
principle is well settled in equity that where one purchases
an estate and pays for it and takes the title in the name of
another, or where one purchases land with the money of
another and takes the title to himself, there arises, by
operation of law, a resulting trust in favor of him whose
money paid for it. 1 Perry on Trusts, § 126; Hill on Trus-
tees, 146; *Foot* v. *Colvin*, 3 John. 216; *Sunderland* v
*Sunderland*, 19 Iowa, 327. This is founded upon the pre
sumption that the party paying for the estate intended it
for his own benefit. But this presumption does not arise
in some excepted cases, where, by reason of the relation of
the parties, the payment of the consideration may be pre-
sumed to be a gift to the nominal purchaser named in the
deed. 1 Perry on Trusts, § 143, *et seq.* Where he who
pays the consideration takes the title in the name of one
for whom he is bound legally and morally to provide, the
presumption is that it was intended as an advancement,
and not a resulting trust; or, as it is sometimes said, that
this circumstance rebuts the presumption of a resulting
trust and creates a presumption that it was done as an
advancement. Where land has been purchased by a hus-
band and the title taken by him in the name of his wife,
the presumption is that it was intended as an advancement
or settlement for the wife, and not as a trust in favor of the
husband. 2 Story Eq. Jr., § 1201, *et seq.* Or, if a husband
permits his wife to use his money to make the purchase in

her own name, no trust results to the husband, but the presumption is that it was intended as an advancement, and operates the same as if he had made the purchase and caused the title to be made to her. *Sunderland* v. *Sunderland, supra; Douglas* v. *Brice,* 4 Rich. Eq. (S. C.) 322. But this presumption may be overcome by evidence. "Whether a purchase in the name of the wife or child is an advancement or not is a question of pure intention, though presumed in the first instance to be a provision and settlement." 1 Perry on Trusts, § 147; Hill on Trustees. 97. Although a resulting trust may be established by parol evidence, yet to have that effect it must be clear and positive. "To make such an effort successful the law, for the safety of titles, requires that the proof shall be of the most convincing and satisfactory kind. Nothing short of certain, definite and convincing proof will justify the court in divesting one man of his title to lands, evidenced by a regular deed, and putting it in another." *Midmer* v. *Midmer,* 26 N. J. Eq. 304; *Boyd* v. *McLean,* 1 John. Ch. 590; *Lench* v. *Lench,* 10 Vesey, 517. Moreover, the *onus* of establishing a resulting trust rests upon him who seeks its enforcement, and before a court of equity will be warranted in making a decree therefor the evidence must be clear, definite and free from doubt. Hence, to entitle the plaintiff to conveyances of the premises in controversy to himself he must fairly establish, if he paid for the property and took title in the name of his wife, that at that time it was mutually understood and was the intention that she should hold the title to the premises, not in her own right, but in trust for him, or, if it was money in her possession belonging to him with which she bought the property and paid for it and took the title to herself, that it was done without his knowledge or consent or direction. As advancements are ordinarily, if not always, voluntary, in order to ascertain whether the transaction was a trust or intended as an advancement, when the title is in the name of the wife, the intention at that time is the point of inquiry, and to which we must look. With these principles in view, we

must examine the evidence to enable us to rightly apply it in determining the true nature of the transactions under consideration.    It appears by the evidence that the plaintiff was married to Mary J., his wife, now deceased, in 1871; that she was a widow several years his senior, and that her occupation at that time was that of a stewardess on one of the Sound steamers; that she was an active, industrious woman, but of more than ordinary force of character, of a temper at times ungovernable, and of a will unyielding when opposed, and which dominated her husband.

There are times, it is true, in the course of their married lives when he makes a show of resistance and attempts to oppose her will, but it always ended in his subjugation to her wishes; for there could be no domestic peace, or, as the evidence runs, "no living with her without it."    For the plaintiff, it may be said that he was industrious, a skilled mechanic, and in receipt of good wages, often working extra hours, for which he received extra pay, in order to add to his savings.    As his wife preferred it, and to please her, he allowed her to take care of his wages, so that when his wages fell due and he was paid, it was his habit to bring them to her to take care of, until needed for some purpose.    There is nothing in the evidence to show at the time of the marriage, or at any other time, that she had any money or property of her own, except as it thus come to her.    As the plaintiff was present at only one of the transactions, and absent at the two others, when the deeds were executed and delivered in her name, we will examine first the circumstances under which this was done. This relates to lot 2, block 239.    Mr. Lyons, of whom this lot was bought, testified that "Mrs. Parker came to me and said that she had heard that I had a lot to sell on Eleventh street.    I told her I had, and asked $500 for it. She said she would give me $450, and I told her she could have it.    Then she said she could not pay the money down; that she had $200 of her husband's money then to pay for the lot, and that she would give his note for the other—for the balance in sixty days, and he gave me his

note for the balance of $250.   Then when the deed was
made out he wanted to make it in his name.   She said,
'Well, you know the property is all yours, but you might
get up and leave me.   The property is all yours, and your
money is paying for it," and Mr. Parker says: 'Why not
make it in my name?' and she says: 'Well, you might get
up and leave me some day if it is made out in your name,'
and he kind of hummed and hawed, and consented at last,
and said, 'Well, let it go.' "

Now, on cross-examination of this witness, he was asked:
Question.   He (Parker) consented in your presence while
you were there that the deed should be made to her ?
Answer.   Well, he didn't consent; he said "let it go," that
is what he said.   Q.   Was there anything said by him just
at that time, or between them, to the effect that she should
hold this property for him?   A.   Yes; she said, "The
property is yours; your money is paying for it; it is all
yours."   Q.   And she took the deed in her name?   A.   Yes;
as a deed of trust.

This shows quite plainly how this witness who sold the
property understood the transaction, and it substantially
corresponds with the testimony of the plaintiff in these
particulars.   In his examination he states how the prop-
erty come to be bought; the amount of money belonging
to him she had with which to make a payment; of his giv-
ing the note for the balance, and the controversy about
the suggestion of putting it in her name, and testifies:
"She said she wanted the property in her name, and we
had some dispute; I did not want her to have it so.   She
told me the property was all mine, anyhow."   And after
explaining that she was quick of temper, and inclined to
be of a jealous disposition, and his disbelief that she ever
intended to defraud him out of this property, he was asked:
Q.   So you consented it should remain in her name?   A.
I didn't consent at all; I don't call that consent.   Q.   Why
did you do so?   A.   I couldn't help it; I couldn't live with
her unless I let her have her own way in these matters.
There is the long and short of it.   And he also says: "The

object seemed to be on her part that she was afraid that I would go away and leave her some time, and wanted to hold it in her name for these reasons,—stated it time and time again."

It is not possible, without encumbering the record, to cite more of the testimony, but when looked at as a whole in regard to this transaction, nothing is plainer than it was not understood nor intended that his wife should take the title to this property absolutely, or otherwise than his property. The idea of an advancement arising from the presumption that the deed was in her name is wholly rebutted when the true nature of the transaction is disclosed, and how that circumstance happened. His wife, inclined to be jealous and distrustful, which was perhaps quickened by her sense of seniority, seems to have thought that with the deed to the property in her name she would have a stronger hold upon him, or security against a loss of his affection, and perhaps, also, that the property itself, in such case, would be more safe against financial accidents; and he, to avoid irritating her and coming in conflict with a temper somewhat ungovernable and robust when opposed, in the interests of domestic peace and happiness, under the circumstances consented that the deed might be put in her name. But in view of the facts, it is clear that neither party, husband or wife, understood that the deed was intended as a settlement or provision for her. The transaction itself shows conclusively that it was a trust.

In respect to lots 1, 2, 3, 4, 5, and 6, in block 103, the plaintiff testifies that he and his wife "talked over the matter of buying these lots, but that he had not made up his mind fully to buy them, when one night after he came home she told him that she had bargained with Allen for the lots, and had paid $100 upon them; that the price was $600, and that she had taken a bond for a deed in her own name; that he objected to it and did not consent that it should be so; that after the bargain was made he permitted her to go and make the payments, and that without

his knowledge or consent she had the deed put in her name." Mr. Allen substantially corroborates his testimony, and testifies that "she remarked to him when she paid him a portion of the money, that Mr. Parker was getting $5 a day at work and the money is his. It is not my money; it is his money that is paying for the property." There is no pretense on her part to disguise the true nature of the transaction. To her neighbors she said the same thing. To Mrs. Pilger she said: "He takes it all; it all goes back to Mr. Parker again." This referred to all the property, and shows how she understood these transactions, and this is in accord with the nature of such transactions as they occurred and the intention to be derived therefrom. As to lots 5 and 6, in block 118, he had a bond for a deed. This he had bought before the marriage, but he had not made all of the payments. And as he was busy at his work during the day, he told her to make the payments as they fell due, and when she made the last one she had the deed put in her name without his knowledge or consent; that he did not know she had a deed until after it was made out in her name. Advancements are usually voluntary and are grounded upon the consent of the donor. When a deed is taken in the name of a wife, and the money of the husband pays the consideration, the law presumes, in the absence of rebutting circumstances, that it was intended by the husband as an advancement; that he so made it, or authorized it, because he so intended or consented. But when the owner of the fund denies the consent or authorization, and the transactions themselves disclose that it was done without his knowledge or consent, no presumption of advancement or provision for his wife can be indulged. Here the case of *Peer* v. *Peer*, 3 Stock. 435, is in point, in which the chancellor says: "It is evident that this defense has its foundation in the fact that the deed was made to Tunis Peer at the request, or at least with the consent, of his mother, for if he procured the deed to be made to himself without her consent, there can be no pretense that it can

be made to assume the shape of an advancement from
mother to son.   To assert that a title made to the son was
an advancement by a parent to his child, when the deed
was made without the knowledge or consent of his parent,
is an absurdity.   See also *Darrin* v. *Darrin,* 58 Mo. 227; 1
Perry on Trusts, § 148, and so in the case before us.

After the property was thus in her name, as his money
had paid for it, the plaintiff testifies that he frequently
requested and urged that the property be properly trans-
ferred to him, and while the evidence discloses she
acknowledged his right, and refused to do it, and when
pressed would become angry and a quarrel would ensue,
always ending in his submission; that the reason of her
refusal was a fear that seemed to haunt her that his fidel-
ity depended upon holding the property in her name, and
also that there was less liability to lose it in such case.
But there can be no doubt that she did not understand that
the property belonged to her in her own right, but recog-
nized that it belonged to him and expected "it would all
go back to Mr. Parker," while the transactions themselves,
in which the purchases and conveyances originated, utterly
preclude the idea of an advancement, and render such a
conclusion impossible and absurd.

Nor does this result work any injustice.   This property
represents the accumulated earnings of the plaintiff's best
manhood, and he should not be stripped of it and it passed
into alien hands, unless he has done so by his own volun-
tary act.   Nor is it irrelevant to say that the record dis-
closes that he has always borne a generous part toward
the defendant and her children, which has been extended
beyond any claim that either she or her children had upon
his kindness or bounty.   The evidence shows that after
his marriage to the mother of the defendant, that the
defendant herself was a widow, residing in the city of New
York, in reduced circumstances, with three little children,
of ages varying from three to eight years; that the plain-
tiff sent $490 to her to pay the expenses of herself and
children to Oregon, and that shortly after her arrival here

she took employment as cook, and that the wife of the plaintiff took these little children to his home and kept them there about five years, during all of which time they were fed and clothed, doctors' bills paid, and sent to school at his expense.

We think the decree must be affirmed, and it is so ordered.

THAYER, C. J., did not concur in the opinion or the decree.