Argued May 19; affirmed in part; reversed in part June 22, 1948

# UNTERKIRCHER *v.* UNTERKIRCHER

195 P. (2d) 178

584

*P. J. Gallagher,* of Ontario, argued the cause for appellant. On the brief were Gallagher & Gallagher, of Ontario.

*Roy Kilpatrick,* of Canyon City, argued the cause for respondent. With him on the brief were Robert D. Lytle and J. R. Campbell, of Vale.

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY and BAILEY, Justices.

BELT, J.

This is a suit to declare a resulting trust and for an accounting. The circuit court awarded judgment against the defendant in the sum of $500.00, but held that she was the absolute owner of the real property in question. From such decree, the plaintiff appeals.

This regrettable controversy between a son and his mother arose out of the following facts. It somewhat involves the story of an Oklahoma family which, as one witness said, "milled around—backward and forward," and finally landed in Ontario, Oregon, broke but contented. Plaintiff, who is thirty-four years of age, is the oldest of three sons born to the defendant and her former husband. Defendant secured a divorce in Oklahoma in 1933, but after the family came to Ore-

gon in March, 1942, the ex-husband apparently joined the family group and lived in the same house, until "kicked out" through the aid of officers of the law. The mother and her son, the plaintiff, came to Oregon in an old Dodge car, and had only one dollar when they arrived. Four dollars were spent en route for a bottle of whiskey, as she thought her son "looked tired." These facts have not much to do with the real issues, but, at least, afford a background to the case.

Plaintiff was inducted into the United States army on April 15, 1942, and was sent to the combat area of the South Pacific. At Port Moresby and other parts of New Guinea—to say nothing of Okinawa—plaintiff saw much of red hell war. While not fighting it seems that he played good poker, as out of his winnings he sent home to his mother, from time to time, various sums, aggregating $3,350.00, for her to hold in trust for him until his discharge and return to the United States. Plaintiff, prior to his marriage, made an allotment of $35.00 per month to his mother. He was willing for his mother to use any money sent by him to cover expenses incurred by her for medicine, clothes or food. He did not want his mother to be in need of anything for her own personal use. Defendant admits that she received $3,350.00 from her son and that she was to keep the money for him. She kept the money in a belt worn around the waist. In one of her letters, she assured plaintiff that she "wouldn't cheat him out of a penny, no, not me dear, just send it ahead." She testified, however, that she never asked her son to send any money home.

While the plaintiff was overseas, the defendant, with his knowledge and consent, used $800.00 of such funds to purchase, on January 17, 1944, a house and

six lots in Ontario, Oregon, and took legal title to the property in her own name.

Plaintiff thus gave his version of the transaction:

"Q Did she (defendant) indicate in there (letters) that she wanted to use the money that you had sent home for this purpose?

"A Yes, she asked my permission to use that money to buy a home for me with. I told her after she had been writing me I didn't want her to have to stay outside nor nothing of the kind, I told her to buy the place and have a home of her own *until I got back.* (Italics ours.)

"Q Did you say anything about where the title to the property would be?

"A I told her—we were in combat at the time, being bombed, and I told her to put the title in her name, and then provided anything should happen to me she wouldn't have to go to Court to get the thing settled up, in other words it would be in her name.

"Q And was she to have use and occupancy of the house until you did return?

"A Right, she was.

"Q And what was the purpose of this arrangement?

"A I just trusted her and I had confidence, I had a world of confidence in her, I figured when I got back there would be no trouble whatsoever, when I came back the place would be mine as I asked her."

While plaintiff was overseas, he corresponded with his girl in Oklahoma and sent to her several hundred dollars. They planned to get married when plaintiff came home on furlough. In one of plaintiff's letters to his future wife, dated August 7, 1944, he mentioned having bought a house and lots in Ontario, and that "it is paid for and all mine" and that if he ever "got out of this dam hole," they were going to live in the

new home. Plaintiff, in response to a question concerning his relations to a "young lady" in Oklahoma, testified:

"Well, I was planning on spending all the money I could gamble for in buying a home so her and I could get married and have a home of our own when I returned, if I did."

Plaintiff came home on thirty days' "Temporary Duty," on December 25, 1944, and immediately sent for his girl in Oklahoma. She came to Ontario and they—accompanied by his brother Bob and wife, his brother Clarence, and his mother—drove to Winnemucca, Nevada, where the marriage ceremony was performed. Plaintiff says that he came home from overseas with about $1,500.00 in cash and that he spent it all, and more too, on this wedding trip. The defendant asserts that she gave to plaintiff the money held by her to cover the expenses of the trip. It does not appear how much was lost in the slot machines in Nevada which, it is said, all of them played. When plaintiff, at the expiration of his furlough, returned overseas to combat duty, his wife went back to Oklahoma. After plaintiff returned to the United States and was discharged from the army in October, 1945, his wife joined him and they went to live in the house occupied by plaintiff's mother and father, his aunt Sophia, and his brother Clarence. It was only a four-room house and trouble soon arose between the bride and the defendant. It seems that there could not be two Queens in the same household. It was, indeed, a house divided against itself. The ex-husband became involved in the family row, and he and his two sons moved across the street to live in another house. Defendant finally ordered the plaintiff and his wife to leave the premises and thereby precipitated this suit.

Defendant asserts that her son made a gift to her of the property in question, and that she has returned to him all the money due. To establish her contention that the home was a gift, defendant relies chiefly on the following letters:

On July 18, 1944, plaintiff thus wrote to defendant:

"Mother the home I bought is yours as I wrote once before that is one reason for me buying it was for you to have a home of your own."

On July 23, 1944, plaintiff wrote:

"Mother dear you can either tell dad or let him read this letter as I want him to know you have full controll of the house and what ever you say goes as that home was bought for you so you can let read this letter if you like."

It was observed that these two letters were written several months after the property was purchased. At the time they were written, much trouble at home had arisen by reason of the conduct of the ex-husband. Defendant had written to plaintiff for authority to have her former husband ousted from the premises. If she had absolute ownership of the property, it was not necessary for her to bother her son about such matters. The two letters seem to have been written for the purpose of impressing upon plaintiff's father the fact that defendant had "full control" of the property. There is no statement in the letters that defendant owned the property. The letters, when considered in the light of the entire record, are not inconsistent with the contention of the plaintiff. If plaintiff was "bumped off," he desired that his mother would have absolute ownership of the property. Plaintiff intended to avoid court procedure by having the title put in his mother's name. If he survived, it is clear that he wanted a home in which to live, but that

if he was "bumped off," the property was to go to his mother.

The testimony of the defendant relative to the transaction is vague and unconvincing. On cross examination she testified:

"Q Isn't it a fact that Will wrote you about the house and told you to take the title in your name so that if he got bumped off there wouldn't be any trouble about probate of the estate or court proceedings?

"A I don't remember.

"Q Don't you remember getting a letter like that?

"A I really don't.

"Q Well, Will testified that he did write to you like that. Will you say that he didn't write to you like that?

"A Well, I can't say because I just don't remember, if I would remember I would say.

"Q Can you definitely say that he didn't write you like that?

"A No, sir, because I don't know for sure, I can't say.

"Q But it is quite possible that what Will said on the stand is true, isn't it?

\* \* \* \*

"A Well, not all.

"Q No, I am simply referring to that part, that particular thing, that he wrote you and told you to take the title in your own name and in case he got bumped off there wouldn't be any trouble about it; isn't it possible that is true?

\* \* \* \*

"A Yes, sir, I understand, I think. That there wouldn't be no trouble if he got bumped off, if the place would be mine?

"Q Yes.

"A Yes, sir.

\* \* \* \*

"Q Do you have that letter in which he told you to buy a home?

"A No, sir, I haven't.

\* \* \* \*

"Q (Mr. Gallagher) When Wilburn wrote you you would have a home as long as he was in the army, was your plan that you and Will would live together after his return from the army?

\* \* \* \*

"A Yes, sir."

In the latter part of her cross examination, the defendant, however, boldly asserted that plaintiff had given her the property.

There is evidence that the father of the plaintiff did some work in repairing the house and incurred some bills in reference thereto, and was insisting on being paid. The defendant wrote to the plaintiff about the matter. On October 18, 1944, the plaintiff, in a letter to his mother, said:

"No Mother I haven't sent Dad the money yet so you go ahead & pay him but have him to give you a written statement that I paid the Ackerman gas bill & all \* \* \* as later I dont want to have it to pay over \* \* \* \*."

If defendant claimed absolute ownership of the property, why was she writing to her son about payment of these bills?

■■ In view of the confidential relationship existing between the plaintiff and his mother, we think it was incumbent upon her to show by clear and convincing evidence that the property in controversy was a gift to her—and this she failed to do. *Carpenter v. Carpenter*, 153 Or. 584, 56 P. (2d) 305, 57 P. (2d) 1098, 58 P. (2d) 507, 105 A. L. R. 386; 24 Am. Jur. 797, § 129, citing numerous authorities in support of the text.

Also see: 38 C. J. S. 869, § 67. As said in *Allen v. Hendrick,* 104 Or. 202, 206 P. 733:

"In order to effect a gift *inter vivos* the donor must divest himself of the thing given and transmit the title to it to the donee gratuitously. The gift operates immediately and irrevocably; it is a gift executed; no contingency of death or otherwise is needed to give it effect."

In *In re Green's Estate,* 288 N. Y. S. 249, 247 App. Div. 540, it is said:

"To establish a valid gift, it must appear that there was a delivery of the property to the donee with an intent upon the part of the donor to immediately divest himself of all title and right thereto, and the evidence must be inconsistent with any other design on his part."

We are convinced that the plaintiff intended after his discharge from the army to live with his bride in the house occupied by his mother. The defendant did not like her son's choice of a wife—and that is the source of much of their trouble. It may be a case of too much mother-in-law.

 The evidence establishes without contradiction that it was the money of the plaintiff that was used to purchase the house and lots. Clearly a resulting trust was created. There was no gift involved. It is a well established rule that when money for the purchase of land is paid or furnished by one person and the deed is taken in the name of another, there is a resulting trust created by implication of law. Justice Lord, in speaking for the court in *Parker v. Newitt,* 18 Or. 274, 23 P. 246—cited with approval in *Neppach v. Norval,* 116 Or. 593, 240 P. 883, 242 P. 605—said:

"The principle is well settled in equity that where one purchases an estate, and pays for it, and takes the title in the name of another, or where

one purchases land with the money of another, and takes the title to himself, there arises, by operation of law, a resulting trust in favor of him whose money paid for it."

Also to the same effect see: *Holohan v. McCarthy,* 130 Or. 577, 281 P. 178; *Lane v. Myers,* 70 Or. 376, 141 P. 1022; *Springer v. Young,* 14 Or. 280, 12 P. 400. We conclude that the plaintiff is the absolute owner of the real property in question and that defendant has no interest therein, and that plaintiff is entitled to a conveyance of the property to him. There are some allegations in the complaint in reference to certain furniture in the house, which plaintiff claims was purchased with his money. We understand from the record that all the furniture to which plaintiff claims ownership has been removed by him and, therefore, such matter is no longer an issue.

■ The record in reference to the amount of money which the defendant returned to the plaintiff is quite meager. Neither the plaintiff nor the defendant kept any account of such transaction. The plaintiff's testimony concerning the amount of money received by him from his mother is very indefinite and uncertain, whereas, her testimony relative to that phase of the case is positive. We are of the opinion that the judgment of $500.00, which the court awarded the plaintiff, is substantially correct and we, therefore, approve the same.

That part of the decree rendering judgment against the defendant for $500.00 is affirmed, but the remainder thereof—with the exception of costs and disbursements—is reversed and the cause remanded with directions to proceed in accordance with this opinion. Each party will pay his own costs and disbursements here and in the circuit court.