Argued and submitted February 24, 1984, affirmed as modified January 23, 1985

ESTATE OF McCONNELL, Deceased, et al,
*Appellants - Cross-Respondents,*

*v.*

McCONNELL et ux,
*Respondents - Cross-Appellants.*

(A8107-04465; CA A27844)

694 P2d 982

Gerald R. Pullen, Portland, argued the cause and filed the briefs for appellants - cross-respondents.

Michael J. Dooney, Seaside, argued the cause and filed the brief for respondents - cross-appellants.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

NEWMAN, J.

Warden, J., concurring in part; dissenting in part.

## NEWMAN, J.

The estate of Jennie McConnell and her son Lloyd McConnell, plaintiffs, appeal from a judgment which declared that defendants own the principal sum of $58,405.95 which, at or before Jennie's death, was in four joint accounts in the name of Jennie McConnell and defendant Fay McConnell or the survivor.[1] On the appeal we modify the judgment to require that defendants pay to plaintiff's estate the sum of $55,769.40 with interest. Defendants cross-appeal from the

---

[1] The accounts were:

|    | Date Opened | Bank | Type of Account | Date Closed | Amount When Closed |
|----|-------------|------|-----------------|-------------|--------------------|
| 1) | 8/3/74 | First Nat'l Bank | Savings | 7/28/81 | $17,981 |
| 2) | 8/3/72 | Pacific First Federal S&L | Savings | 2/12/80 | $26,531 |
| 3) | 9/15/72 | First Nat'l Bank | Checking | 8/4/81 | $    744 |
| 4) | 5/4/74 | Oregon Trail Savings S&L | Savings | 2/12/80 | $28,737 |

The joint savings accounts included rights of survivorship. Lloyd does not dispute that the joint checking account was similarly owned. The court arrived at the figure of $58,405.95 by subtracting the proceeds of the house sale ($43,395.20) and the amount in the joint trustee account ($8,028.94) from the total sum of $109,830.09 that Lloyd claims that Fay withdrew for personal purposes. We account for the $109,830.09 as follows:

1. $6,234.79: money spent by Fay for Jennie's personal use (items 1 through 4, *infra* at 5).

2. $2,028.94: amount from trustee account (item 5, *infra* at 5).

3. $5,000: amount from the trustee account (item 6, *infra* at 5).

4. $55,769.40: Fay's personal purpose withdrawals from joint accounts (items 7 through 9, *infra* at 5).

5. $4,395.20: a portion of the house proceeds remaining in a joint savings account at Jennie's death that passes to Fay.

6. $10,000: a portion of the house proceeds in a joint savings account at Jennie's death that passes to Fay.

7. $3,586.56: non-house proceeds remaining in a joint savings account at Jennie's death that pass to Fay.

8. $744: amount in a joint checking account at Jennie's death that passes to Fay.

9. $22,071.20: a portion of the house proceeds (and $2,071.20 interest) that defendants must restore to the estate.

judgment that declared that the estate owns the principal sum of $43,395.20 from the pre-death sale of Jennie's Portland residence.[2] We modify the judgment to reduce that principal sum to $22,071.

Jennie's will, executed in 1960, named her two sons, Fay and Lloyd, as equal beneficiaries. Between 1972 and 1974, she opened the four joint accounts. In 1973, she also established an account at Pacific First Federal Savings & Loan in her name as trustee for Fay and Lloyd, as beneficiaries. Before Jennie's death, Fay made no contribution of his own funds to any of the accounts.

Jennie's health was good until 1978. In July 1979, she went into the hospital. In August 1979, she entered a nursing home in Portland. She was hospitalized for ten days in February 1980, returned to the nursing home until September 1980, was again hospitalized for three weeks and then returned to the nursing home until her death on February 5, 1981, at the age of 90. She had remained mentally alert until near the end of January 1981.

Fay and his wife, Peggy, live in Seaside. Jennie's husband, the father of Fay and Lloyd, died in 1972. Thereafter, Fay visited Jennie in Portland two or three times a month and took care of house repairs, yard maintenance and some shopping. After she became ill in 1978, he visited weekly and sometimes as often as four or five times a week. Lloyd visited Jennie monthly while he lived in Portland. In 1978 he moved to Rockaway, where he owned and operated a tavern, and then he visited Jennie only occasionally.

In August 1979, Jennie gave Fay a power of attorney to sell her home and handle her other affairs. At that time,

---

[2] The declaratory judgment provides:

"(1) The Plaintiff estate is declared to be the owner of those funds generated from the sale of the decedent's residence in the sum of $43,395.20, plus interest thereon at the rate of 9% per annum from the 25th day of June, 1980, and from the Trustee account held in the Pacific First Federal Savings & Loan in the sum of $8,028.94, plus interest thereon at the rate of 9% per annum from the 7th day of March, 1980.

"(2) The Defendants are declared to be the joint owners of the balance of the funds earlier held jointly by the decedent and FAY GLIFFORD McCONNELL in the amount of $58,405.95, plus interest accruing thereon.

"(3) The Plaintiffs shall have judgment for costs in the amount of $475.00."

Fay's attorney advised him to use the funds in the joint accounts only for Jennie's care. Plaintiffs contend that Fay thereafter made withdrawals from the accounts for his personal use. At Jennie's death two of the joint accounts were still in existence.[3] On March 7, 1980, using the power of attorney (and, according to his testimony, following Jennie's instructions), Fay withdrew the balance of $8,028.94 from the trustee account. He deposited $6,000 in a joint savings account with Jennie at First National Bank and the remaining $2,028.94 in an account in his own name. Fay withdrew the $6,000 from the joint account before Jennie's death, and none of the funds from the trustee account were in the joint accounts at her death. Fay does not challenge that part of the court's judgment which declared that Jennie's estate should receive the $8,028.94 that he took from the trustee account.

Fay used the power of attorney to sell Jennie's home, and on June 25, 1980, he received $43,395.20 as proceeds from that sale. Defendants assert in their cross-appeal that the court should not have declared that that money belongs to the estate. Of those funds, $14,395.20 was in the joint savings account at First National Bank at the time of Jennie's death.[4]

There are three principal, interrelated questions:

(1) Do the balances in the two joint accounts existing at Jennie's death belong to Fay?

(2) Must Fay return to the estate any sums he withdrew from the four joint accounts for his personal use before Jennie's death?

(3) Do the proceeds, or any portion of them, from the sale of Jennie's residence belong to the estate?

Our review is *de novo*.

---

[3] On March 19, 1981, Fay withdrew $17,981.76 from the First National Bank joint savings account, closed the account and deposited the funds into a joint account with Peggy. In July 1981, he withdrew $744 from the First National Bank joint checking account with Jennie, closed the account and deposited the funds in a joint savings account with Peggy.

[4] Of the $17,981.76 remaining in the First National Bank joint savings account at the time of Jennie's death, $14,395.20 ($4,395.20 plus $10,000), with interest accrued from the date of the respective deposits, came from the proceeds of the house sale. $4,395.20 was part of the $13,395.20 deposited into that account in June, 1980. $10,000 came from proceeds in December 1980, of a joint certificate of deposit. *See infra* at 12.

■ Initially, we conclude that the balances in the two joint accounts at Jennie's death belong to Fay,[5] other than proceeds from the sale of Jennie's house that we discuss *infra* at 10.

In *Williams v. Mallory,* 284 Or 397, 587 P2d 85 (1978), the court quoted approvingly from Wellman, *The Joint and Survivor Account in Michigan - Progress Through Confusion,* 63 Mich L Rev, 629, 645 (1965):

> " '* * * [P]eople who use joint and survivorship accounts usually intend the survivorship benefits they express. When such an account is intact at the donor depositor's death, the estate of the donor, if unable to show fraud, undue influence, or lack of capacity, will probably not prevail if all it can show is that a reason other than to confer benefits at death attended the opening of the account. Probably it must *also* be shown that it would have been capricious or highly unusual for the decedent to have wanted the death benefits to go to the survivor in light of the decedent's circumstances, the pattern of his family relationships, and the terms of his other testamentary directions.' " 284 Or at 401.

There is no evidence that Jennie created the joint accounts as the result of undue influence, lack of capacity or fraud; neither was it capricious or highly unusual for Jennie to have wanted those accounts to belong to Fay at her death. Therefore, we look to the evidence to find the intent of the parties at the time the account was established. Plaintiffs have the burden of proving that Jennie intended that the money in the joint accounts pass to the estate. *Williams v. Mallory, supra,* 284 Or at 402.

Fay testified that, shortly before his father's death, his parents called him to come over to their house. His father said, "You better go now to your mother." He went with his mother to the banks and changed the account cards on two of the savings accounts so that they were joint accounts with Jennie and Fay. Fay testified that he was surprised when his

---

[5] Although not applicable to the facts here, joint accounts with right of survivorship opened after January 1, 1978, are governed by ORS 708.616:

> "Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent, unless there is clear and convincing evidence of a different intention at the time the account is created."

name was put on the accounts and that he did not know the amount of money in the accounts until 1974. Peggy testified that Jennie's husband had been ill and the two of them wanted the accounts in Jennie's name with Fay. She testified that "[Jennie's husband] wanted it done specially." Jennie's establishment of the trustee account in 1973 and designation of *both* sons as beneficiaries is also some evidence that she intended Fay to be the sole owner of the four joint accounts if he survived her.

Plaintiffs presented no evidence that Jennie intended that the funds in the accounts that represent deposits made by her should pass to her estate instead of to Fay. Plaintiffs have not met their burden of showing that, other than proceeds from the sale of Jennie's house which we discuss *infra* at 10, the money remaining in the joint accounts at Jennie's death should pass to plaintiff estate instead of to defendants.

Lloyd claims that Fay withdrew the following sums from the joint accounts for his personal use before Jennie's death:

1) $ 2,000.00 from First National savings account on 8/8/79
2) 350.00 from First National savings account on 9/27/79
3) 864.79 from First National checking account on 1/80
4) 3,020.00 from First National checking account on 4/80-1/81
5) 2,028.94 from Pacific First Federal savings account on 3/7/80
6) 5,000.00 from First National savings account on 6/25/80
7) 500.00 from Oregon Trail savings account on 1/16/80
8) 26,531.81 closed Pacific First Federal savings account on 2/12/80
9) 28,737.59 closed Oregon Trail savings account on 2/12/80

The first three withdrawals (items 1, 2 and 3) were for car repairs and gas expenses related to trips that Fay made from Seaside to Portland to visit Jennie. The checking account withdrawals totaling $3,020 in item 4 were for expenses relating to Jennie's care. Thus, items 1 through 4 were withdrawals for Jennie's benefit and not for Fay's personal use. Items 5 and 6 apparently represent portions of the trustee account that are specifically referred to in a portion of the judgment that defendants do not challenge.

Fay did not show that he used the $500 withdrawal (item 7) for Jennie's benefit. He deposited the $26,531 withdrawal (item 8) in a joint account with Peggy and used the

$28,737 withdrawal (item 9) to purchase a $9,000 Datsun pickup and a $15,000 motor home in his own name. He offered no evidence as to what he did with the remaining $4,737 of that withdrawal. Fay's withdrawals of items 7, 8 and 9, totaling $55,769.40, were for his personal use.

The court found:

> "I really interpret the statements of the mother to be that the funds will be his property after she dies and not during her lifetime. If that is correct, then he had the right to those funds regardless of the will. And the fact that he used the funds during his mother's lifetime in circumstances for his own benefit, which the Court would not treat as a gift, it seems to me is immaterial and becomes moot, because the funds would be his at any rate upon her death."

Fay's withdrawals during Jennie's lifetime, however, are not "moot." Jennie retained the power to revoke the accounts during her lifetime. *See Greenwood v. Beeson,* 253 Or 318, 322, 454 P2d 633 (1969). Fay must return the funds to the estate unless defendants have shown that Jennie intended, at the time he made the withdrawals for his own benefit, to make immediate and absolute gifts to him of these sums, that the gifts were delivered to him and that he accepted them. *Johnson v. Steen,* 281 Or 361, 369, 575 P2d 141 (1978); *Manning v. U. S. Nat. Bank,* 174 Or 118, 131, 148 P2d 255 (1944). Defendants assert that Fay's withdrawals for his personal use were valid gifts.

■    The trial court did not consider Fay's withdrawals as *"inter vivos* gifts" from Jennie, and as to items 7, 8 and 9, neither do we. Under the facts here the evidence to sustain these withdrawals as *inter vivos* gifts, an assertion not made until after Jennie's death, must be clear and convincing and every essential element of the gifts must be proved, *Carpenter v. Carpenter,* 153 Or 584, 601-602, 56 P2d 305, 57 P2d 1098, 58 P2d 507 (1936), particularly when the "donee" and "donor" were in a confidential relationship. *Unterkircher v. Unterkircher,* 183 Or 583, 590, 195 P2d 178 (1948).

Fay testified that Jennie knew of and agreed to all withdrawals, that she told him it was his money and he could use it as he pleased and that she encouraged him to buy a new car and approved of his purchase of the Datsun and the motor home. Fay testified that he hoped to use the motor home to

take Jennie on a trip to Texas if her health improved. He testified that he fully disclosed to Jennie all financial transactions, that she ratified them and that he regularly showed her the bank account statements and checkbook records. He testified that her typical response to his proposals was, "Go ahead and use the money, because it's all yours anyway." Defendants, however, did not report any gifts on the pertinent section of their 1980 Oregon Homeowner and Renter Tax Refund form.

Peggy testified that Jennie often said to her and to Fay, "Someday all the money is going to be yours and, Peggy, all you've done for me—you'll be paid for it someday." Peggy also testified that Jennie approved Fay's purchases of the Datsun and the motor home. Fay's son Jim testified that Jennie told him that all the money would be his father's someday.

A neighbor confirmed the significant amount of time that Fay spent with his mother. Another neighbor testified that Jennie told her five or six times over the years that "she didn't like her money going for liquor and drinking, and that is what Lloyd would spend it for." Peggy said that Jennie's husband had told her that he did not want his money going for drinking and that Jennie had said many times that she "didn't want her money drank up" by Lloyd. Lloyd acknowledged that 28 years ago he drank "too much."

Lloyd testified that he knew none of the details of the joint bank accounts or of Fay's withdrawals until after his mother's death. He said that Jennie once told him that he must get the bank books because something is "dreadfully wrong" and on two other occasions that she asked him to get the bank books. Once, he said, he asked his wife to call Fay about the books, but Fay hung up on her.

Jennie's nephew, Harold Ryan, testified that he visited her weekly in the nursing home, that she told him she wanted her estate "divided equally" and that the boys would share in "the money and the home." Ryan testified, however, that decedent never complained about Fay's handling of her financial affairs. Fay testified:

"I asked my mother or told my mother again that I had talked to Harold [Ryan] and that he had said that Lloyd and I

were to share things equally. And so I asked her again if that's what she really meant. She said, 'Oh, well, what I tell Harold and what I do are two different things.' "

Although we recognize that neighbors corroborated the time Fay spent assisting Jennie and her concern about Lloyd's alleged drinking, we conclude that Fay did not present clear and convincing evidence, particularly from disinterested parties, of Jennie's intent to make gifts to him of items 7, 8 and 9. Accordingly, on the appeal we hold that defendants must pay to the estate the sum of the three personal withdrawals (items 7, 8 and 9) totaling $55,769.40, plus interest.[6]

Using the power of attorney from Jennie, Fay sold her home for cash in June 1980. The court found:

"I think a different situation exists as far as the home is concerned. The home is not governed by the depository agreement. * * * But as I view it, upon her death, if it had not been sold, the house would, of course, have gone into the estate, would have been sold and the funds divided between the two sons. I do not think that the evidence supports the claim here that the mother intended to make a gift of the monies derived from the sale of the house. There is some testimony concerning that, but I think the burden to prove that a gift was made of those funds rests on Fay McConnell and his wife, and I do not think they carried that burden."

■ Plaintiffs do not contest that Fay's sale of the house as attorney-in-fact for Jennie, under the power of attorney that she had given him, was in accord with Jennie's wishes.[7] Fay testified that Jennie instructed him to deposit $30,000 of the proceeds from the house sale in a joint account with Peggy and to deposit the balance of $13,395.20 in one of the joint

---

[6] This sum is smaller than the amount of $58,405.95 used in the decree, because that sum apparently includes a portion of the trustee account that defendants have agreed to return to the estate.

[7] The record contains the following exchange between court and counsel:

"THE COURT: And you say it is interesting about the power of attorney. I don't think there is any evidence here, do you, to show that the sale of the house was not in accord with the wishes of Jennie. The question that is involved is what was to be done with the money, right?

"[Plaintiffs' counsel]: All right. I can't really honestly contest that.

"THE COURT: I don't think anybody has indicated that she didn't agree that she would never get back to the house and that it ought to be sold, although those exact words weren't actually used, as I recall."

savings accounts with Jennie. Although Fay testified that Jennie intended to give the $30,000 to him in June 1980, he did not follow the instructions that he testified that Jennie gave to him to put that sum in a joint account with Peggy. Instead, after telling Jennie of his intention, he purchased a bank certificate of deposit in the joint names of Jennie and himself with right of survivorship. His testimony that Jennie intended to make a gift to him of the $30,000 is not convincing. His action, on the other hand, is consistent with Jennie's intent that she implemented in the early 1970's to place substantial portions of her assets in joint accounts with Fay with right of survivorship. Fay did not carry his burden of proof that in June 1980 Jennie intended to make a gift of the $30,000 to him.[8]

■      On December 19, 1980, when the $30,000 joint certificate of deposit matured, Fay deposited $20,000 of it, plus accrued interest of $2,071, in a savings certificate in the names of Peggy, himself and their son. Fay contends that Jennie made a gift to him of these sums at that time. He did not establish, however, by clear and convincing evidence that that was then Jennie's intent.

■      On that same date, however, Fay put $10,000 of the remaining funds from the joint certificate of deposit in a joint savings account with Jennie at First National Bank. It was in that account at the time of her death. Fay's action was consistent with his action in June 1980 of placing the $30,000 of house proceeds in joint names with Jennie with right of survivorship and also with his action at that time, described below, as to the $13,395.20 of house proceeds. Both of those actions in June were consistent with Jennie's intent in establishing the joint accounts with him in the early 1970's. Fay's action with respect to the $10,000 was also consistent with Jennie's intent in establishing the joint accounts with him in the early 1970's and was appropriate. The burden, therefore, passed to plaintiffs to show that those funds should not go to Fay as part of the funds remaining in the joint accounts at Jennie's death. Plaintiffs did not meet that burden.

---

[8] Fay's acts are also some evidence that, assuming that Jennie intended, at that time, to make a gift, Fay did not accept the gift. He had the burden of proving not only Jennie's intent to make a gift and that the gift was delivered, but that he accepted the gift. *See supra* at 7.

As to the balance of $13,395.20 of the house proceeds, Fay placed it in the joint savings account with Jennie at the First National Bank on June 30, 1980. Fay did not claim that Jennie intended to make a gift to him of that sum at that time. Jennie retained the power to withdraw and use the funds. Fay's testimony with respect to deposit of those sums is convincing. As noted, it is also consistent with Jennie's actions in establishing the joint accounts with Fay in the early 1970's. The burden, therefore, passed to plaintiffs to show that the funds that remained in the joint accounts at Jennie's death should not go to Fay. They did not meet that burden.[9] On the cross-appeal, therefore, we modify plaintiffs' judgment to reduce it to $22,071 and affirm it as modified.

Accordingly, paragraphs 1, 2 and 3 of the judgment are modified to provide:

"(1)   The Plaintiff estate is declared to be the owner of a) $22,071 of funds generated from the sale of the decedent's residence, plus interest thereon at the rate of 9% per annum from the 25th day of June, 1980, and b) the funds from Trustee account held in the Pacific First Federal Savings & Loan in the sum of $8,028.94, plus interest thereon at the rate of 9% per annum from the 7th day of March, 1980.

"(2)   The Plaintiff estate is declared to be the owner of funds earlier held jointly by the decedent and FAY GIFFORD McCONNELL in the amount of $55,769.40, plus interest accruing thereon.

"(3)   The Plaintiffs shall have judgment for costs in the amount of $475.00."

The judgment is affirmed as modified.

**WARDEN, J.,** concurring in part; dissenting in part.

I generally concur in the majority decision but dissent

---

[9] Before Jennie's death, Fay transferred $9,000 of that $13,395.20 from the joint savings account to the joint checking account with Jennie. The record does not show what portion of that $9,000 Fay withdrew before Jennie's death or for what purposes, but Lloyd does not claim that those withdrawals were made for Fay's personal use. Even if some of these funds are part of the $3,020 (item 4) that Lloyd claims was withdrawn for Fay's personal use, Fay withdrew item 4 for Jennie's benefit. Defendants, therefore, need not restore that $9,000 to the estate. Also, of the original $13,395.20 deposit from the house proceeds, $4,395.20 remained in the savings account at the time of Jennie's death and passes to Fay.

from its award of $14,395.20 of the proceeds from the sale of the decedent's home to defendant Fay McConnell.

The majority correctly concludes that Fay did not carry his burden to prove that the decedent intended to make a gift to him in June 1980 of $30,000 of the proceeds from the sale of the home. (71 Or App at 805.) It then goes on to award him $10,000 of the proceeds, which Fay placed in a joint savings account with the decedent, and the balance of the proceeds, $13,395.20. The majority finds an award of the $10,000 joint savings account created by Fay from the decedent's funds to be appropriate, because it is "consistent with [the decedent's] intent in establishing the joint accounts with him in the early 1970's * * *." (71 Or App at 806.) It awards the $13,395.20[1] to Fay on the same basis and because it finds his testimony "convincing." It asserts that the burden then shifted to plaintiffs to prove that those funds "should not go to Fay" and concludes that plaintiffs have not met that burden.

I do not find Fay's testimony about these sums, totaling $23,295.20, to be any more convincing than his testimony that the decedent intended to make him a gift of the $30,000. The majority's finding that it was consistent with the decedent's acts in creating joint accounts with Fay in the early 1970's is untenable. The earlier joint accounts were created and funded by the decedent with her own funds; the accounts in issue were primarily funded from the decedent's funds by Fay, while he stood in a fiduciary relationship with her. Fay's unconvincing testimony and the majority's incorrect finding cannot support a conclusion that the burden of proof shifted to plaintiffs. It remained Fay's, and he failed to carry it.

The majority finds that Fay failed to carry his burden to prove that the decedent intended to make him a gift of $30,000 of the proceeds from the sale of the decedent's home, even though he testified that she did. It concludes, however, that Fay is entitled to the $10,000 savings account, which he claimed as part of that gift, and to the $13,395.20 balance of the proceeds, in spite of the fact that he did not even claim that the decedent intended to make a gift of it to him. Surprising conclusions!

---

[1]For some reason not evident from the briefs, plaintiffs do not contest the award of $9,000 of the proceeds of the sale of the house to Fay, but only the remaining $4,395.20.

I cannot concur in the majority's awarding defendant Fay McConnell the contested sum of $14,395.20 from the proceeds of the sale of the decedent's home. Therefore, I dissent from that part of the majority decision.